Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
April 20, 2020

**2020 CO 26**

**No. 18SC582, *People v. Lujan*—Sixth Amendment—Right to a Public Trial—Trivial Courtroom Closures.**

In this case, the supreme court considers whether a brief courtroom closure to reread a previously given jury instruction violates a defendant's right to a public trial under the U.S. and Colorado Constitutions. Specifically, the supreme court considers the propriety of a triviality standard under which some courtroom closures are so trivial that they do not violate a defendant's public trial right. The supreme court first holds that the triviality standard is appropriate in Colorado and therefore elects to adopt that standard. The supreme court then holds that the courtroom closure in this case was trivial because it did not undermine the purposes of the public trial right guaranteed by the U.S. and Colorado Constitutions; hence, the closure here did not violate the defendant's right to a public trial. Accordingly, the judgment of the court of appeals is reversed and the

case is remanded to that court to address the defendant's remaining contentions

on appeal.

**2020 CO 26**

**Supreme Court Case No. 18SC582**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 15CA1176

**Petitioner:**

The People of the State of Colorado,

v.

**Respondent:**

Abel Lujan.

**Judgment Reversed**
*en banc*
April 20, 2020

**Attorneys for Petitioner:**
Philip J. Weiser, Attorney General
Brittany L. Limes, Assistant Attorney General
    *Denver, Colorado*

**Attorneys for Respondent:**
Haddon, Morgan and Foreman, P.C.
Adam Mueller
    *Denver, Colorado*

**JUSTICE BOATRIGHT** delivered the Opinion of the Court.
**JUSTICE MÁRQUEZ** dissents, and **JUSTICE GABRIEL** and **JUSTICE HART**
join in the dissent.

¶1     Abel Lujan was charged with first-degree murder for the death of his girlfriend after she was found beaten and strangled behind a friend's house. At trial, two women testified for the People about Lujan's prior violent behavior towards them. Prior to admitting this evidence, the trial court read a limiting instruction, telling the jury that it could only consider the evidence for the purposes of establishing Lujan's motive, intent, or common plan. A copy of this instruction was not given to the jury for deliberations; however, the jury did receive an instruction at the close of the evidence explaining that certain evidence could only be considered for the limited purposes for which it was admitted.

¶2     While the jury was deliberating, it submitted a question asking for clarification about the limiting instruction that the court had read during trial specifying the permissible purposes for which the jury could consider the evidence of Lujan's prior violent behavior. Over defense counsel's objection, the trial court cleared the courtroom of the public and parties, leaving only the judge, bailiff, and court reporter; the judge then brought in the jury and reread the limiting instruction that it had previously read twice in open court. The jury ultimately found Lujan guilty of second-degree murder.

¶3     Lujan appealed, arguing that the court's actions when rereading the jury instruction constituted a courtroom closure that violated his Sixth Amendment right to a public trial. A division of the court of appeals agreed, reversing Lujan's

1

conviction for second-degree murder and remanding the case for a new trial. *People v. Lujan*, 2018 COA 95, ¶ 19, __ P.3d __. On certiorari review, the People do not contest that a courtroom closure occurred; rather, the People's argument pertains to the *nature* of the closure itself. Specifically, the People urge this court to adopt a triviality standard that is used in many jurisdictions, under which a defendant's constitutional right to a public trial is not violated when the closure at issue was trivial. In so doing, the People argue that the brief courtroom closure here was trivial and therefore did not violate Lujan's public trial right.[1]

¶4      We agree that adopting a triviality standard is appropriate in Colorado. Further, after applying the triviality standard, we hold that the courtroom closure in this case was trivial because it did not undermine the purposes of the public trial right guaranteed by the U.S. and Colorado Constitutions; hence, the closure here did not violate Lujan's right to a public trial. We therefore reverse the

---

[1] We granted certiorari to review the following issues:

  1. Whether a brief courtroom closure to re-read a previously given instruction violates a criminal defendant's right to a public trial.

  2. Whether a remand is an appropriate remedy when the trial court fails to make findings consistent with *Waller v. Georgia*, 467 U.S. 39 (1984).

judgment of the court of appeals and remand to that court to address Lujan's remaining contentions on appeal.

## I. Facts and Procedural History

¶5     In 1999, Lujan's girlfriend was found beaten and strangled to death. Fourteen years later, the People charged Lujan with one count of first-degree murder for her death.  At trial, Lujan admitted to causing his girlfriend's death, but he contended that he did not do so intentionally or after deliberation.  Instead, he argued that he was only guilty of reckless manslaughter because he acted impulsively and did not plan to kill her.

¶6     During its case-in-chief, the People called both Lujan's ex-wife and his former girlfriend to testify to his prior violent behavior towards them, over defense counsel's objection.  Both women testified that Lujan had previously hit them and tried to either strangle or suffocate them.  Before each woman testified to these facts, the trial court read a limiting instruction regarding CRE 404(b), informing the jury that it was admitting the evidence for the limited purposes of establishing Lujan's motive, intent, or common plan.

¶7     After the close of evidence, the trial court gave the jury an instruction regarding the 404(b) evidence: "The Court admitted certain evidence for a limited

3

purpose. You are instructed that you cannot consider that evidence except for the limited purpose I told you about when it was admitted."[2]

¶8     During deliberations, the jury submitted a question to the trial court: "Please write down the statement for the limited use statement [sic] on the testimonies of [the two women]." Defense counsel objected to sending a written version of the earlier limiting instruction unless it contained a statement that the jury could not consider the evidence for propensity purposes. The court overruled defense counsel's objection. The People then suggested that the court bring the jury into the courtroom and reread the prior limiting instruction to the jury. Ultimately, the court provided defense counsel with two options: (1) sending the jury a written version of the limiting instruction as it had read previously (without any added propensity language); or (2) bringing the jury back in and rereading that instruction aloud. Defense counsel chose the second option, at which point the court stated that it would "do that when the courtroom is clear." Concerned with the court's decision to clear the courtroom, defense counsel responded, "I don't think the Court can do that." The court nevertheless cleared the courtroom and reread the limiting instruction aloud to the jury, telling the jury that it could only

_____

[2] This proposed instruction tracked the model jury instruction that existed at the time of Lujan's trial. *See* CJI-Crim. D:02 (2008).

4

consider certain portions of Lujan's ex-wife's and former girlfriend's testimony for the purposes of establishing motive, intent, or common plan:

> All right. Good morning ladies and gentlemen. I'm going to read to you the instructions I read contemporaneous[ly] with the testimony of [Lujan's ex-wife] and [Lujan's former girlfriend]. You are about to hear testimony from [Lujan's former girlfriend] relating to incidents which occurred in 2005. This evidence has been admitted for a limited purpose only. Specifically, you may consider this evidence as it relates to Mr. Lujan's motive in committing the acts in this case. You may also consider this evidence as it relates to his intent in committing the crime and as it relates to the mental state in this case. You may further consider this—the evidence as it relates to whether Mr. Lujan acted in accordance with the common plan. You may not consider it for any other purposes.
>
> You are about to hear evidence from [Lujan's ex-wife] related to incidents which occurred in 1991, 1993, and 1996. This evidence has been admitted for a limited purpose only. Specifically, you may consider this evidence as it relates to Mr. Lujan's motive in committing the acts in this case. You may also consider this evidence as it relates to his intent in committing the crime and as it relates to the mental state in this case. You may further consider this—the evidence as it relates to whether Mr. Lujan acted in accordance with the common plan. You may not consider it for any other purposes.
>
> That—those are in the instructions. Okay. So thank you.

The only people present in the courtroom when this occurred were the trial judge, the bailiff, the court reporter, and the jury. This instruction was the same as the limiting instruction that the trial court had previously read to the jury twice in open court. The jury then completed its deliberations and found Lujan not guilty of first-degree murder but guilty of second-degree murder.

¶9 Lujan appealed, contending that the trial court violated his right to a public trial under the U.S. and Colorado Constitutions when it closed the courtroom to reread the limiting instruction. In response, the People conceded that the trial court did in fact close the courtroom, but they argued that the nature of the closure did not amount to a constitutional violation. In so arguing, the People urged the court of appeals to adopt a triviality standard under which a defendant's right to a public trial is not violated when the closure at issue was trivial. The People further argued that under that standard, the closure here was so trivial that it did not violate Lujan's public trial right. But the court of appeals concluded that it need not consider whether to adopt a triviality standard because the closure here was plainly not trivial. *Lujan*, ¶ 16. Instead, it held that "the closure of the courtroom was total, intentional, and unjustified," meaning it had violated Lujan's Sixth Amendment right to a public trial. *Id.* at ¶ 19. The court then concluded that the error was structural, vacated Lujan's conviction, and remanded the case for a new trial. *Id.* Because it reversed on these grounds, the court declined to address the remaining issues Lujan raised on appeal. *Id.* at ¶ 8.

¶10 We granted certiorari and now reverse the judgment of the court of appeals and remand to that court to consider Lujan's remaining contentions on appeal.

6

## II. Standard of Review

¶11 "A trial court's decision to close the courtroom presents a mixed question of law and fact." *People v. Hassen*, 2015 CO 49, ¶ 5, 351 P.3d 418, 420. "In reviewing such questions, 'we accept the trial court's findings of fact absent an abuse of discretion, but we review the court's legal conclusions de novo.'" *Id.* (quoting *Peña–Rodriguez v. People*, 2015 CO 31, ¶ 8, 350 P.3d 287, 289, *rev'd on other grounds*, 137 S. Ct. 855 (2017)).

## III. Analysis

¶12 We begin by reviewing the relevant law pertaining to a defendant's constitutional right to a public trial and the values furthered by that right. We then consider the triviality standard used by other jurisdictions for assessing whether a courtroom closure violates a defendant's public trial right, and we elect to adopt that standard. Then, applying the triviality standard, we hold that the courtroom closure in this case was trivial because it did not undermine the purposes of the public trial right guaranteed by the U.S. and Colorado Constitutions; hence, the closure here did not violate Lujan's right to a public trial. We therefore reverse the judgment of the court of appeals and remand to that court to address Lujan's remaining contentions on appeal.

## A. The Right to a Public Trial and the Triviality Standard

¶13 Criminal defendants are guaranteed the right to a public trial under both the U.S. and Colorado Constitutions. U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16. Courts have "uniformly recognized the public trial guarantee as one created for the benefit of the defendant." *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979).

¶14 Viewed broadly, the public trial right "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 508 (1984). More specifically, the right furthers four particular values: (1) "to ensure a fair trial," (2) "to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions," (3) "to encourage witnesses to come forward," and (4) "to discourage perjury." *Peterson v. Williams*, 85 F.3d 39, 43 (2d Cir. 1996) (citing *Waller v. Georgia*, 467 U.S. 39, 46–47 (1984)).

¶15 But while the public trial right confers significant protections on criminal defendants, it is not absolute. *See, e.g.*, *Waller*, 467 U.S. at 45; *Peterson*, 85 F.3d at 42. The U.S. Supreme Court has recognized that the right "may yield to competing interests." *Hassen*, ¶ 8, 351 P.3d at 421 (citing *Waller*, 467 U.S. at 45). In *Waller*, the Court articulated four requirements for a valid courtroom closure: (1) "the party seeking to close the [proceeding] must advance an overriding interest that is likely

to be prejudiced"; (2) "the closure must be no broader than necessary to protect that interest"; (3) "the trial court must consider reasonable alternatives to closing the proceeding"; and (4) the court "must make findings adequate to support the closure." 467 U.S. at 48.

¶16 But courts across the country have concluded that, in certain instances, even if a trial court fails to make the necessary findings under *Waller*, the Sixth Amendment is not necessarily violated "every time the public is excluded from the courtroom." *Peterson*, 85 F.3d at 40; *see also State v. Northcutt*, 358 P.3d 179, 183 (Mont. 2015). Indeed, many jurisdictions have held that some closures are simply so trivial that they do not rise to the level of a constitutional violation. *See, e.g.*, *Peterson*, 85 F.3d at 42.

¶17 In *Peterson*, the Second Circuit became the first court to establish this "triviality" approach. In that case, the trial court closed the courtroom during the testimony of an undercover officer. *Id.* at 41. After the conclusion of the officer's testimony, the trial court inadvertently neglected to reopen the courtroom while the defendant briefly took the stand. *Id.* Once defense counsel realized that the courtroom had remained closed, she moved for a mistrial, which the trial court denied. *Id.* at 41–42. The Second Circuit affirmed the trial court's decision, holding that "even an unjustified closure may, on its facts, be so trivial as to not violate" a defendant's public trial right. *Id.* at 40.

9

¶18 In reaching this holding, the Second Circuit explained that the triviality standard "does not dismiss a defendant's claim on the grounds that the defendant was guilty anyway or that he did not suffer 'prejudice' or 'specific injury.'" *Id.* at 42. Rather, it considers "whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant—whether otherwise innocent or guilty—of the protections conferred by the Sixth Amendment." *Id.*

¶19 When determining whether a closure was so trivial that it did not violate a defendant's public trial right, courts look to the totality of the circumstances surrounding the closure. *See Braun v. Powell*, 227 F.3d 908, 918–19 (7th Cir. 2000); *Kelly v. State*, 6 A.3d 396, 407 (Md. Ct. Spec. App. 2010). Factors to be considered include the duration of the closure, the substance of the proceedings that occurred during the closure, whether the proceedings were later memorialized in open court or placed on the record, whether the closure was intentional, and whether the closure was total or partial. *See, e.g., Peterson*, 85 F.3d at 43; *United States v. Perry*, 479 F.3d 885, 890–91 (D.C. Cir. 2007); *Kelly*, 6 A.3d at 407. No one factor is determinative when considering whether a closure was trivial. *See, e.g., Peterson*, 85 F.3d at 43; *Kelly*, 6 A.3d at 408. Moreover, the list of factors that we provide is nonexhaustive; other considerations may be relevant in determining whether a courtroom closure was trivial. *See Kelly*, 6 A.3d at 407 n.10; *State v. Schierman*, 438 P.3d 1063, 1082 (Wash. 2018).

¶20    On one prior occasion we considered the Second Circuit's triviality framework. *See Hassen*, ¶ 15, 351 P.3d at 422. In *Hassen*, the trial court closed the courtroom during the testimony of two undercover officers over the defendant's objection. *Id.* at ¶¶ 2–3, 351 P.3d at 420. On appeal to this court, the People argued that the closure was so trivial that it did not violate the defendant's public trial right. *Id.* at ¶ 13, 351 P.3d at 421. Although the People raised a triviality argument on appeal, we determined that we need not consider whether to adopt the triviality standard because the closure "was plainly not trivial." *Id.* at ¶ 15, 351 P.3d at 422. We reasoned that the closure was long in duration, it "prevented potential witnesses from coming forward to contradict" the officers' testimony, and it "failed to discourage perjury" as the witnesses were aware that the courtroom was closed. *Id.* at ¶ 16, 351 P.3d at 422.

¶21    Although we did not opine on the propriety of the triviality standard in *Hassen*, we note that it has gained acceptance since the Second Circuit first adopted it over two decades ago. *See, e.g.*, *Perry*, 479 F.3d at 890–91 (exclusion of defendant's eight-year-old son from entire trial was trivial); *United States v. Ivester*, 316 F.3d 955, 960 (9th Cir. 2003) (exclusion of "spectators during the brief mid-trial questioning of the jurors" was trivial); *Braun*, 227 F.3d at 919 (exclusion of member of jury venire not selected to serve as a juror from entire trial was trivial); *People v. Bui*, 107 Cal. Rptr. 3d 585, 593, 595 (Cal. Ct. App. 2010) (exclusion of three

11

individuals during voir dire for roughly forty minutes was trivial); *Northcutt*, 358 P.3d at 185 (presiding judge making an inquiry to a deliberating jury without counsel or defendant present to ask whether it would render a verdict that day was trivial); *State v. Decker*, 907 N.W.2d 378, 385 (N.D. 2018) (exclusion of lawyer unconnected with the case during voir dire was trivial). *But see United States v. Agosto-Vega*, 617 F.3d 541, 544–54, 548 (1st Cir. 2010) (declining to adopt the triviality standard where the trial court excluded a defendant's family members during jury selection); *Smith v. Smith*, No. 17-673 (JRT/TNL), 2018 WL 3696601, at *8 (D. Minn. Aug. 3, 2018) (questioning "whether the triviality exception conforms with the Sixth Amendment").

¶22   The jurisdictions that have adopted the Second Circuit's triviality framework continue to recognize the importance of the right to a public trial. But they nevertheless acknowledge that certain courtroom closures do not implicate the values furthered by the public trial right, and thus do not warrant reversal. As one court recently explained in embracing the triviality standard, "we must . . . avoid enforcing the public trial right in a manner so rigid and mechanistic that we do more harm than good to the values underlying that right." *Schierman*, 438 P.3d at 1081. That court further noted that "a rule requiring automatic reversal for every erroneous closure, no matter how inconsequential to the ultimate

fairness of the trial, is more likely to diminish than promote public confidence in the judiciary." *Id.*

¶23 We find the rationale employed by these jurisdictions for adopting the triviality standard to be persuasive. Moreover, the triviality standard simply makes sense. Some closures are in fact so inconsequential, so de minimis that they do not violate a defendant's Sixth Amendment right to a public trial. Thus, we elect to adopt the triviality standard today.

¶24 In adopting the triviality standard, we emphasize that it is distinct from a harmless error standard. *See, e.g.*, *Peterson*, 85 F.3d at 42; *Kelly*, 6 A.3d at 406. Under harmless error, we consider whether "there is a reasonable possibility that the [error] might have contributed to the conviction." *Hagos v. People*, 2012 CO 63, ¶ 11, 288 P.3d 116, 119 (quoting *Chapman v. California*, 367 U.S. 18, 24 (1967) (emphasis omitted) (alteration in *Hagos*)). The triviality standard, on the other hand, does not consider the effect that the closure had on the *outcome* of the trial, but rather "looks to whether the closure implicated the protections and values of the Sixth Amendment." *Kelly*, 6 A.3d at 406. In other words, the triviality framework considers whether a closure amounted to any error at all. *Peterson*, 85 F.3d at 42.

13

¶25    With this triviality framework in mind, we now consider whether the trial

court's closure of the courtroom while it reread a limiting instruction to the jury

violated Lujan's Sixth Amendment right to a public trial.

## B.  The Closure in This Case

¶26    Lujan contends that the closure here was not trivial and thus his right to a

public trial was violated.  Specifically, Lujan argues that the courtroom closure in

this case was far from trivial because it was deliberate, it was "total in scope," and

it encompassed both himself and his lawyer, thereby violating his constitutional

rights to be present and to counsel.  In contrast, the People concede that what

occurred here was a closure, but argue that the closure was trivial because it was

short in duration, it was transcribed by the court reporter, it involved rereading

an instruction that had been previously read twice in open court, and it did not

involve witness testimony, the presentation of evidence, or any novel legal issues.

¶27    We agree with the People.  Applying the triviality standard, we conclude

that the closure here was trivial because it did not undermine the values advanced

by the public trial guarantee.  Therefore, Lujan's Sixth Amendment right to a

public trial was not violated.

¶28    As detailed above, under the triviality standard, we look to the closure at

issue and consider whether it implicated the protections and values of the public

trial right; namely, (1) "to ensure a fair trial," (2) "to remind the prosecutor and

14

judge of their responsibility to the accused and the importance of their functions," (3) "to encourage witnesses to come forward," and (4) "to discourage perjury." *Peterson*, 85 F.3d at 42. We now address the interplay between the closure in this case and each of these four values in turn.

¶29 First, we must determine whether the closure here implicated the value of ensuring Lujan a fair trial. Lujan is correct that the closure was complete and encompassed both him and his lawyer; everyone other than the court personnel were excluded. That fact cuts against ensuring that Lujan received a fair trial. But that fact alone is not determinative; we must weigh additional facts when considering the totality of the circumstances. Those facts include that the closure itself was extremely brief, lasting only a matter of minutes, and that the trial court merely reread to the jury a limiting instruction that it had previously read in open court. Moreover, Lujan's counsel received the opportunity to discuss the limiting instruction and lodge any objections to it in open court prior to the trial court rereading it to the jury. Ultimately, the court did exactly what it said it would do. There was not any additional conversation, instruction, or clarification given by the judge. His exchange with the jury was the functional equivalent of tendering the limiting instruction to the jury and then removing it after each juror had read it. Accordingly, the public and the parties still had the ability to serve as watchdog to ensure fairness to Lujan, both in general and with specific regard to the limiting

15

instruction during the two previous times it was read in open court. Because of the short duration of the closure, coupled with the context in which it occurred and the parties' ability to discuss and object to the instruction prior to the closure, we are satisfied that it did not affect the fairness of Lujan's trial.[3]

¶30 Second, we must assess whether the closure here subverted either the judge's or the prosecutors' awareness of their responsibility to Lujan and the importance of their functions. Lujan argues that the closure did undermine this value "because of the fraught relationship between the trial court and defense counsel throughout trial." Resp't's Answer Br. 27. He further contends that because the closure was total in scope, "there was no way to guarantee that what defense counsel perceived as 'hostility' did not translate to and affect the jury." *Id.* In Lujan's view, the court may have conveyed this hostility when it reread the instruction to the jury during the closure.

¶31 In support of this contention, Lujan notes that after the court gave defense counsel the option of either the court rereading the limiting instruction to the jury

_____

[3] Lujan contends that the closure here undermined the fairness of his trial because it violated his constitutional right to be present at trial and his right to counsel. This issue is not before us today. Lujan made this assertion as a *separate* claim before the court of appeals, which the court declined to address because it found that the closure violated his public trial right. Therefore, we do not opine on the merits of this contention today.

16

aloud or submitting it in writing, Lujan's counsel stated, "Judge, I'm sorry, I'm frustrating the Court again." The court then replied, "[y]ou are not frustrating me." But while this exchange as described by defense counsel does illustrate counsel's concern about the possible tension between him and the court, the court denied being frustrated and defense counsel did not make any further record on the issue. Thus, the record does not support defense counsel's concern that the court exhibited any hostility towards him or Lujan when it reread the instruction to the jury. In reaching that conclusion, we recognize that a review of the transcript does not provide insight into the trial judge's demeanor or tone during the closure, but it does reveal that the judge did what he had done on two prior occasions in open court: read the limiting instruction. And the court did basically what the jury requested. The jury wanted to be reminded about what the limiting instruction permitted. And that is what the court did, albeit verbally and not in writing. Additionally, Lujan points to no specific actions on the part of the court during the course of the trial that would substantiate the claim that the court conveyed hostility or frustration towards Lujan or his counsel when it reread the limiting instruction to the jury.

¶32 Having rejected Lujan's specific contention regarding hostility, we conclude that the closure here did not subvert either the judge's or the prosecutors' awareness of their responsibility to Lujan and the importance of their functions.

17

To begin, the prosecutors were also excluded from the courtroom. And although we recognize that this was a total closure, as opposed to merely excluding certain members of the public, the trial judge was not the only person present when he reread the limiting instruction to the jury. Rather, both the bailiff and the court reporter were present during the closure and, more importantly, the court reporter transcribed the judge's exchange with the jury. This measure, "while not a substitute for real-time public observation, certainly served to remind the court . . . of [its] responsibilities and provide a check on possible bias." *Schierman*, 438 P.3d at 1082. What is more, the record in no way suggests that the closure caused the court to lose sight of the importance of its function or its responsibility to Lujan. And as we discussed above, the trial judge gave Lujan's counsel the opportunity to discuss the limiting instruction and lodge any objections to it in open court prior to the brief closure. The transcript reveals that the trial judge did what he said he would do: He reread the instruction that the jury asked for in writing. Further, the judge did not add anything to the instruction nor did he comment on it. In sum, the judge's actions would not have changed if the courtroom had not been closed. Thus, we conclude that the trial judge realized the importance of its responsibility to Lujan.

¶33 Third, we must consider whether the closure discouraged witnesses from coming forward. When the closure occurred, the presentation of evidence was

18

over. *See Northcutt*, 358 P.3d at 185 (concluding that a courtroom closure was trivial because "[t]he interaction between [the trial court] and the jury occurred after evidence and argument had concluded, and involved no witnesses or presentation of testimony"); *see also Schierman*, 438 P.3d at 1080 (concluding the same where the closure "involved no witness testimony, no questioning of potential jurors, and no presentation of evidence"). Additionally, the interaction between the trial court and the jury during the closure only consisted of the court reading the limiting instruction that it had read to the jury two times previously; thus, it did not involve a new evidentiary or legal issue. Accordingly, we are satisfied that the brief closure here did not impact the value of encouraging witnesses to come forward.

¶34 Finally, we must consider whether the closure here implicated the value of discouraging perjury. As we noted with the third value discussed above, the brief closure occurred after the presentation of evidence and argument had concluded, and after the case had been submitted to the jury for deliberations. *See Ivester*, 316 F.3d at 960 (concluding that a courtroom closure was trivial because it "did not infect any witness's testimony" and "[i]t did not even infect counsel's opening or closing arguments to the jurors"). Because the closure in this case did not involve witness testimony, we conclude that it had no bearing on this value.

¶35 Despite recognizing that the closure here did not implicate the values of encouraging witnesses to come forward or discouraging perjury, Lujan contends that deliberate courtroom closures, like the closure at issue here, can *never* be considered trivial. But this simply is not accurate. Indeed, several courts have found that certain deliberate closures were trivial. *See, e.g., Perry*, 479 F.3d at 887–88, 890–91 (deliberately excluding a defendant's eight-year-old son from the courtroom was trivial); *Ivester*, 316 F.3d at 960 (deliberately excluding "spectators during the brief mid-trial questioning of the jurors" was trivial); *Braun*, 227 F.3d at 919 (although deliberately excluding a member of the jury venire not selected to serve as a juror was "a close[] situation," the circumstances surrounding the closure showed that it was trivial); *Schierman*, 438 P.3d at 1082–83 (although the exclusion of spectators during an in-chambers discussion regarding challenges to jurors for cause "was not inadvertent," it was nevertheless trivial). While the fact that a closure was deliberate should certainly be considered under a triviality analysis, it is not determinative.

¶36 Here, we agree with Lujan that the trial court did close the courtroom deliberately. The deliberateness of the closure, however, did not undermine the public trial values discussed above when viewed in light of the totality of the circumstances. Indeed, because the closure was brief in duration, involved the trial court rereading a limiting instruction that it had previously read twice in open

20

court, was transcribed by the court reporter, and occurred after the trial court gave the parties the opportunity to discuss the instruction and lodge objections to it in open court, we conclude that it did not undermine the values advanced by a defendant's right to a public trial.

¶37 We recognize that a trial court's decision to close a courtroom during a criminal trial does run the risk of violating the public trial guarantee and, therefore, the risk of requiring a new trial. But based on the narrow facts presented in this case, we conclude that the brief courtroom closure here was trivial and thus did not amount to a violation of Lujan's Sixth Amendment public trial right.[4]

## IV. Conclusion

¶38 For the foregoing reasons, we reverse the judgment of the court of appeals and remand the case to that court to address Lujan's remaining contentions on appeal.

**JUSTICE MÁRQUEZ** dissents, and **JUSTICE GABRIEL** and **JUSTICE HART** join in the dissent.

---

[4] Because we conclude that the closure here was trivial and did not violate Lujan's right to a public trial, we need not consider whether a remand is an appropriate remedy when the trial court fails to make findings consistent with *Waller*. *Cf. Hassen*, ¶ 17 n.4, 351 P.3d at 422 n.4 (holding that a new trial was the proper remedy rather than a remand because, unlike in *Waller*, "the improper closure occurred *during* the trial," meaning it was "impossible for the trial court to simply 'redo' the questioning of" witnesses who testified during the closure).

JUSTICE MÁRQUEZ, dissenting.

¶39 "While the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance, the Framers plainly thought them nonetheless real." *Waller v. Georgia*, 467 U.S. 39, 49 n.9 (1984). Indeed, a criminal defendant's constitutional right to a public trial is considered so important that the erroneous deprivation of that right constitutes structural error. *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017) ("[A] violation of the right to a public trial is a structural error."); *People v. Hassen*, 2015 CO 49, ¶ 7, 351 P.3d 418, 420 ("When the trial court erroneously deprives the defendant of his public trial right, the error is structural in nature."). In other words, a violation of this right amounts to error that affects the very framework of the trial itself. *Weaver*, 137 S. Ct. at 1907. Accordingly, where, as here, the defendant objects at trial to such error and raises the issue on direct appeal, the defendant generally is entitled to automatic reversal regardless of the error's actual effect on the outcome of the trial. *Id.* at 1910; *Hassen*, ¶ 7 & n.2, 351 P.3d at 420 & n.2.

¶40 We need not decide today whether certain erroneous courtroom closures may be so "trivial" that they do not violate a defendant's Sixth Amendment right to a public trial. This is because, as we determined in *Hassen*, "the closure here was plainly not trivial." *Hassen*, ¶ 15, 351 P.3d at 422. Unlike the "entirely inadvertent" closure at issue in *Peterson v. Williams*, 85 F.3d 39, 44 (2d Cir. 1996),

22

the seminal case establishing the "triviality" analysis adopted by the majority, maj. op. ¶¶ 4, 17–25, the closure here was quite deliberate, was based on the court's mistake of law, and proceeded over the defendant's objection. In addition, the closure here excluded not only the public from the courtroom, but also counsel and the defendant himself, and occurred while the court verbally instructed the jury on a key evidentiary issue about which the jury had expressed confusion during deliberations. In short, the courtroom closure here was "total, intentional, and unjustified," *People v. Lujan*, 2018 COA 95, ¶ 19, __ P.3d __, and thus undermined the interests served by a public trial. Because the majority's adoption of a triviality standard is not warranted on these facts, and because the closure here was not trivial in any event, I respectfully dissent.

## I. Factual Background

¶41 The People charged Lujan with first degree murder for the death of his girlfriend. At trial, Lujan conceded that he caused the girlfriend's death, but argued that he was guilty only of reckless manslaughter and did not act intentionally or after deliberation (as required for first degree murder). Over Lujan's CRE 404(b) objection, the People called his ex-wife and former girlfriend to testify about Lujan's prior behavior toward them, including that he had hit and tried to strangle or suffocate them. Before these witnesses testified, the trial court gave a contemporaneous limiting instruction stating that this evidence was for the

limited purposes of establishing Lujan's motive, intent, or common plan. At the close of evidence, the jury was instructed only generally that "[t]he Court admitted certain evidence for a limited purpose. You are instructed that you cannot consider that evidence except for the limited purpose I told you about when it was admitted."

¶42 During deliberations, the jury submitted a question to the court about the limited purposes for which it could use the other acts evidence: "Please write down the statement for the limited use statement [sic] on the testimonies of [Lujan's ex-wife and former girlfriend]."

¶43 After convening with counsel to discuss the jury's question, the court proposed sending the jury a written version of the limiting instruction it had given before the witnesses testified. Defense counsel objected to sending the written instruction unless the instruction expressly stated that the evidence could not be used for propensity purposes—language that the court had previously rejected. The People then suggested bringing the jury out and reading aloud the limiting instruction the court had given previously. After continued back-and-forth, defense counsel finally requested that if the court was going to give the original limiting instruction, it bring the jury into the courtroom and read the instruction aloud as the People had suggested. The court then insisted that it would clear the

24

courtroom if it read the instruction aloud because it could "never bring the jury out in front of the parties" during deliberations:

> Court: "I'll do that when the courtroom is clear. I don't want people— you are all out if I do that. I'll bring them out and read it."

> Defense counsel: "I don't think that the Court can do that."

> Court: "Yes, I can. The jury is in deliberation, [counsel]. You never bring a jury out in front of the parties again."

> Defense counsel: "When the court is reading an instruction?"

> Court: "I'll read it on the record. You don't have to [be] worried about it. . . ."

> Defense counsel: "I don't want the court to do it, but if the court is overruling—I don't understand—I just—"

> Court: "I'm either going to read the instruction once and send them back, or I'm going to send back this written instruction. Those are your choices. If I bring it out and read it to them, nobody is in here but me, my bailiff and the court reporter. . . . It's a deliberating jury."

> . . .

> Court: "I'll bring them out. I'll instruct them. It will be on the record and it will be part of the appeal. Okay. That's over your objection. All right. Clear the Court and do that and then they will continue deliberations."

> Defense counsel: "Judge, can the Court just note that when the Court does make the record, that we are not in the courtroom, please—"

> Court: "Of course."

> Defense counsel: "—and we are allowed to be."

¶44 The court then closed the courtroom, expelling the public, counsel, and Lujan. It then re-read the contested limiting instruction to the jury. In so doing,

the court failed to make the record that Lujan's counsel had requested. The jury ultimately convicted Lujan of second degree murder.

## II. Law

## A. The Right to a Public Trial

¶45 The roots of a criminal defendant's constitutional right to a public trial reach back to the eleventh century. *See Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 505 (1984). Although courts and procedures have changed significantly since that time, one thing has remained constant: "the public character of the trial at which guilt or innocence was decided." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 566 (1980).

¶46 Importantly, a public trial serves both the criminal defendant *and* the public. Certainly, the right to a public trial protects a criminal defendant by allowing the public to see that an accused is "fairly dealt with and not unjustly condemned." *Waller*, 467 U.S. at 46 (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979)). The presence of spectators also serves to keep the prosecutor, judge, and jurors "keenly alive to a sense of their responsibility and to the importance of their functions." *Id.* (quoting *Gannett*, 443 U.S. at 380). And a public trial "encourages witnesses to come forward and discourages perjury." *Id.*

¶47 But the U.S. Supreme Court has also emphasized that the right to a public trial extends beyond the defendant: it maintains crucial public faith in the justice

26

system and provides the community an important outlet for its reactions to criminal acts. *See Press-Enter. Co.*, 464 U.S. at 509 ("[P]ublic proceedings vindicate the concerns of the victims and the community in knowing that offenders are being brought to account for their criminal conduct by jurors fairly and openly selected."); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606 (1982) ("Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole."). A public trial thus ensures basic fairness to the defendant, but also enhances "the appearance of fairness so essential to public confidence in the system." *Press-Enter. Co.*, 464 U.S. at 508.

## B. The *Waller* Requirements

¶48 The right to a public trial is not absolute; it must in some situations yield to other rights or interests, including a defendant's right to a fair trial or the state's interest in protecting sensitive information. *Waller*, 467 U.S. at 45. But as the Supreme Court has observed, such circumstances "will be rare." *Id.* In *Press-Enterprise*, a case grounded in the First Amendment, the Court held that closure requires an overriding interest:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Press-Enter. Co.*, 464 U.S. at 510.

¶49     In *Waller*, the Court relied on *Press-Enterprise* and directly incorporated these factors into its Sixth Amendment analysis of the public trial right.  467 U.S. at 45–46, 48.  Thus, to justify closure of the courtroom,

> (1) the party seeking to close the proceeding must advance an overriding interest that is likely to be prejudiced;
>
> (2) the closure must be no broader than necessary to protect this interest;
>
> (3) the court must consider reasonable alternatives to closing the proceeding; and
>
> (4) the court must make findings adequate to support the closure.

*Id.* at 48.  Where the courtroom is closed and these factors are not met, the defendant's right to a public trial is violated.  *Id.* at 48–49.

¶50     Importantly, the erroneous deprivation of the right to a public trial is structural error. *Weaver*, 137 S. Ct. at 1908; *Hassen*, ¶ 7, 351 P.3d at 420.  Such error is structural not because it necessarily renders a trial fundamentally unfair in every case, but "because of the 'difficulty of assessing the effect of the error,'" and because the public trial right "also protects some interests that do not belong to the defendant," namely the rights of the public and the press. *See Weaver*, 137 S. Ct. at 1910 (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 n.4 (2006)).  Where, as here, the defendant objects at trial to such error and raises the issue on direct appeal, the defendant generally is entitled to automatic reversal regardless

28

of the error's actual effect on the outcome of the trial. *Id.*; *Hassen*, ¶ 7 & n.2, 351 P.3d at 420 & n.2.

## C. The *Peterson* Triviality Standard

¶51 The majority adopts today a "triviality" standard first articulated by the Second Circuit in *Peterson v. Williams*, 85 F.3d 39 (2d Cir. 1996). In that case, the court concluded that "even an unjustified closure may, on its facts, be so trivial as not to violate" a criminal defendant's Sixth Amendment right to a public trial. *Id.* at 40. There, following the proper closure of the courtroom during the testimony of an undercover officer, the trial court accidentally forgot to reopen the courtroom for twenty minutes, during which time the defendant testified. *Id.* at 41–42. The Second Circuit narrowly held that "in the context of this case, where the closure was 1) extremely short, 2) followed by a helpful summation, and 3) entirely inadvertent," the defendant's Sixth Amendment right was not violated. *Id.* at 44. The *Peterson* court repeatedly focused on the brief and inadvertent nature of the closure, relying on *Snyder v. Coiner*, 365 F. Supp. 321, 324 (N.D. W. Va. 1973), and *United States v. Al-Smadi*, 15 F.3d 153, 154–55 (10th Cir. 1994), both of which involved inadvertent closures that went unnoticed by any of the trial participants. *Peterson*, 85 F.3d at 42–43. The court emphasized that it was *not* holding that the Sixth Amendment is not violated just because a closure is brief, or inadvertent, or because what occurs *in camera* is later repeated in open court. *Id.* at 44. In fact, the

court expressly noted that an *intentional* improper closure "could threaten a defendant's right to a fair trial," even if the closure is brief and its contents summarized in open court. *Id.* at 44 n.8.

¶52 More recently, in *United States v. Gupta*, 699 F.3d 682 (2d Cir. 2012), the Second Circuit emphasized the limits of its ruling in *Peterson* as it considered the intentional closing of a courtroom during voir dire. Noting that several courts have adopted the *Peterson* triviality analysis, the Second Circuit took pains to emphasize the doctrine's "narrow application." *Gupta*, 699 F.3d at 688. There, the court held that "[w]hatever the outer boundaries of our 'triviality standard' may be . . ., [the] trial court's intentional, unjustified closure of a courtroom . . . cannot be deemed 'trivial.'" *Id.* at 689. It emphasized that "the value of openness" guaranteed by a public trial "lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed" because "the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known." *Id.* (quoting *Press-Enter. Co.*, 464 U.S. at 508). The Second Circuit stressed that "it is the openness of the proceeding itself, regardless of what actually transpires, that imparts 'the appearance of fairness so essential to public confidence in the system' as a whole." *Id.* (quoting *Press-Enter. Co.*, 464 U.S. at 508).

¶53 Where courts have adopted the Second Circuit's triviality standard, including in the cases cited by the majority, they generally apply it only where the closures were either unintentional, *e.g.*, *Kelly v. State*, 6 A.3d 396, 407 (Md. Ct. Spec. App. 2010) (holding closure was trivial where a sheriff's officer had closed the courtroom to the public); or partial, *e.g.*, *United States v. Perry*, 479 F.3d 885, 890–91 (D.C. Cir. 2007) (holding exclusion of the defendant's eight-year-old son was trivial); *Braun v. Powell*, 227 F.3d 908, 917–19 (7th Cir. 2000) (holding court's exclusion of a former member of the jury venire from the trial was trivial); or both unintentional and partial, *e.g.*, *State v. Decker*, 907 N.W.2d 378, 381, 385 (N.D. 2018) (holding closure was trivial where deputies excluded one person who was unrelated to the case).

¶54 Even where the triviality standard has been applied to closures that were not merely inadvertent or partial, courts have focused on other factors that showed the public trial right was not undermined. Some courts have focused on whether the closure concerned "an administrative jury problem," such as a discussion about jurors' safety that did not affect the fundamental fairness of the proceedings. *United States v. Ivester*, 316 F.3d 955, 957–58, 960 (9th Cir. 2003). Still others have emphasized the defendant's failure to object to a closure, reasoning that "the lack of objection is some indication that the trial remained fundamentally fair." *State v. Schierman*, 438 P.3d 1063, 1082 (Wash. 2018). Notably, in concluding that the

closure in that case was trivial, the Washington Supreme Court emphasized in *Schierman* the importance of striking a "careful balance" to avoid treating violations of the public trial right as harmless after the fact:

> On one hand, we must craft a rule that avoids . . . the conflation of specific procedural rights with a vague right to fundamentally "fair" proceedings. The temptation created by that approach, to excuse procedural violations as harmless after the fact, leads predictably to the result that procedural rights become entirely unenforceable. . . . [T]his outcome poses unacceptable risks to our system of justice . . . .

*Id.* at 1081 (citations omitted).

¶55 Finally, I note that although several courts have adopted the Second Circuit's triviality analysis, it has never been endorsed by the U.S. Supreme Court. Ironically, the triviality analysis is triggered only where a closure fails to comply with *Waller* and therefore is "unjustified" — in other words, only where the right to a public trial has been violated. And though the U.S. Supreme Court has made clear that such error is structural (and therefore not susceptible to a harmless error analysis), *Weaver*, 137 S. Ct. at 1908, the triviality standard effectively places a burden on the defendant to show prejudice to the values promoted by a public trial, including, specifically, the value of a "fair trial," maj. op. ¶¶ 28–29 (citing

*Peterson*, 85 F.3d at 42).[5]  Although the majority stresses this is not a harmless error analysis, *id.* at ¶ 24 (citing *Peterson*, 85 F.3d at 42), it is difficult to square this approach with the idea that a violation of the right to a public trial is structural error.

### III.  Application

¶56  Although there may be some closures that are so insignificant that they do not implicate the constitutional right to a public trial, we need not rule today on the propriety of the Second Circuit's triviality analysis because even if that standard applied, the closure here plainly was not trivial.  *See Hassen*, ¶ 15, 351 P.3d at 422.  Unlike the "entirely inadvertent" closure in *Peterson*, the courtroom closure here was "total, intentional, and unjustified," *Lujan*, ¶ 19, and undermined the interests served by a public trial.

¶57  First, unlike many cases cited by the majority applying the triviality standard to a court's exclusion of specific individuals, *see Perry*, 479 F.3d at 890–91; *Braun*, 227 F.3d at 917–19; *Decker*, 907 N.W.2d at 385, the closure here was total in scope: the court barred not only the public from the courtroom, but also

---

[5] *Peterson*'s reference to the value of a "fair trial" is its own articulation of the values described in *Waller*; this phrasing does not appear in *Waller*'s discussion of those values.  *Waller*, 467 U.S. at 46.

counsel and even Lujan himself.[6]  The majority also points out that the bailiff and court reporter remained in the courtroom, maj. op. ¶¶ 8, 32, but the presence of court personnel in the courtroom is no substitute for the public's attendance at a trial, let alone a substitute for the presence of counsel or the defendant himself. Moreover, although the majority states that "the trial judge did what he said he would do," *id*. at ¶ 32; *see also id.* at ¶ 29, in fact, the transcript shows that the judge did not lay the record requested by defense counsel.  And for that matter, that the exchange was "transcribed by the court reporter" and made part of the record, *id.* at ¶ 26, is not a substitute for a summation in open court of what occurred during the closed proceedings.  *Cf. Peterson*, 85 F.3d at 44 (noting that "what went on *in camera* was later repeated in open court").

¶58     Next, in stark contrast to the "entirely inadvertent" closure in *Peterson* and similar cases cited by the majority, *see Kelly*, 6 A.3d at 407; *Decker*, 907 N.W.2d at 385, the closure here was clearly deliberate.  Importantly, the Second Circuit acknowledged in *Peterson* that an *intentional* improper closure "can threaten a defendant's right to a fair trial, even when the closure is for a brief time."  85 F.3d

---

[6] Lujan also argued on appeal that the closure violated his constitutional right to be present at trial.  *Lujan*, ¶ 8.  Under this court's ruling today, the case must be remanded to the court of appeals to address this contention.  *See id.*; maj. op. ¶ 38.

at 44 n.8. Whatever the boundaries of the triviality doctrine may be, even the court that came up with the standard held that an "intentional, unjustified exclusion of the public" violated the Sixth Amendment. *Gupta*, 699 F.3d at 685. And unlike *Peterson* and other cases relied on by the majority, the closure here did not go unnoticed by the trial participants, nor did defense counsel acquiesce in the closure. To the contrary, the court closed the courtroom over defense counsel's express objection. *See Schierman*, 438 P.3d at 1081.

¶59 Importantly, the closure here was plainly unjustified, and the People do not argue otherwise. The court offered no "overriding interest" required by *Waller* to justify excluding the public, counsel, and Lujan from the proceedings. Instead, it closed the courtroom based solely on its mistaken belief that the jury could never be brought back into open court during deliberations.[7]

---

[7] Colorado courts have previously acknowledged that trial courts can bring juries back into the courtroom during deliberations, *DeBella v. People*, 233 P.3d 664, 669 (Colo. 2010) (holding that a court may require that video evidence be viewed in open court rather than give a jury unfettered access during deliberations), and that the defendant has a constitutional right to be present when the court does so, *People v. Payne*, 2014 COA 81, ¶ 20, 361 P.3d 1040, 1044 (holding that the "defendant had a constitutional right to be present while the trial court read the modified *Allen* instruction in open court and that his constitutional right was denied").

¶60 Finally, the courtroom was not closed in this case to address an administrative matter. Rather, the closure here took place during the court's verbal instructions to the jury, a critical stage of the proceedings encompassed by the public trial right. *State v. Brown*, 815 N.W.2d 609, 616 (Minn. 2012) (applying the public trial right to the court's closure of the courtroom for jury instructions). Although the majority emphasizes that the court merely reread a previously given instruction, maj. op. ¶¶ 2, 8, 29, 36, I am unpersuaded that this makes any difference. Under the majority's logic, the court could close the courtroom after the close of evidence when instructing the jury on reasonable doubt or the prosecution's burden of proof, yet such a closure would be "trivial" because the court would be merely repeating the same instructions given to the jury at the beginning of the trial. That cannot be. Here, the court was instructing the jury on a key evidentiary issue about which the jury had expressed confusion during deliberations.

¶61 Once the court decided to read the instruction aloud to the jury, the proceeding needed to be open to the public. Instruction of the jury historically has occurred in open court; doing so ensures that the judge and jurors are "keenly alive to a sense of their responsibility and to the importance of their functions." *Waller*, 467 U.S. at 46 (quoting *Gannett*, 443 U.S. at 380). The intentional and total closure of the courtroom, during a critical stage of the proceedings, "undercuts the

36

legitimacy of the criminal justice process." *United States v. Canady*, 126 F.3d 352, 363 (2d Cir. 1997) (holding court's failure to read the verdict in open court violated the defendant's right to a public trial). Accordingly, Lujan's constitutional right to a public trial was violated, and he should receive a new trial.

## III. Conclusion

¶62 Unfortunately, I take no solace in the majority's purported limitation of this holding to the "narrow facts" of this case. Maj. op. ¶ 37. To adopt a triviality standard in an appropriate case and apply it to truly trivial closures would be one thing. But here, the majority has deemed a closure "trivial" where the closure was total, intentional, and unjustified. Because the majority's adoption of a triviality standard is not warranted on these facts, and because the closure here was not trivial in any event, I respectfully dissent.

I am authorized to state that JUSTICE GABRIEL and JUSTICE HART join in this dissent.