

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

---

## NO. PD-0504-20

---

### APRIL LOREACE WILLIAMS, Appellant

### v.

### THE STATE OF TEXAS

---

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW FROM THE FOURTH COURT OF APPEALS GUADALUPE COUNTY

---

SLAUGHTER, J., delivered the opinion of the Court in which RICHARDSON, YEARY, KEEL, and MCCLURE, JJ., joined. NEWELL, J., filed a concurring opinion in which KELLER, P.J., and HERVEY, J., joined. WALKER, J., filed a dissenting opinion.

## O P I N I O N

Does the temporary physical exclusion from a courtroom of a defendant's family member for the testimony of one witness at trial violate the Sixth Amendment right to a public trial when the excluded individual was virtually included by permitting him to

observe the witness's testimony via a live video feed from a neighboring courtroom? Under the specific facts of this case, we hold that it does not. But, we caution that courts should rarely exclude any member of the public from a courtroom during criminal case proceedings. And before doing so, the court must consider the factors under *Waller v. Georgia*, 467 U.S. 39 (1984), to ensure that any such exclusion is justified. Nevertheless, under the narrow circumstances presented here, we conclude that the traditional *Waller* factors are not dispositive because, even assuming that the trial court's actions resulted in a partial closure of the courtroom, any such closure was so trivial or *de minimis* that it did not infringe on the values served by the Sixth Amendment. In so finding, we disagree with the court of appeals' conclusion that Appellant's right to a public trial was violated. Accordingly, we reverse the lower court's judgment and remand the case to that court for further proceedings.

## I.    Background

The Seguin Police Department organized a "controlled buy" of drugs wherein a confidential informant, Josh Brown,[1] purchased crack cocaine from Appellant. Based on her sale of drugs to Brown, Appellant was indicted for delivery of a controlled substance, Penalty Group 1, in an amount of four grams or more but less than 200 grams.[2]

---

[1] When addressing pretrial matters prior to the commencement of voir dire, the State moved to use a pseudonym to refer to the confidential informant in this case. The defense objected. The prosecutor responded that the State did this "all the time in cases involving confidential informants" and that, contrary to defense counsel's assertion, use of a pseudonym has no bearing on Appellant's right of confrontation. The trial court ultimately granted the State's motion. We will therefore continue to use the pseudonym adopted by the trial court here.

[2] *See* TEX. HEALTH & SAFETY CODE § 481.112(d).

At Appellant's jury trial, the State first called Detective Jaime Diaz as a witness. Detective Diaz testified that on the day in question, he provided Brown with $180 in cash and special sunglasses equipped with a hidden recording device. Diaz then dropped Brown off near Brown's house. Shortly thereafter, Diaz observed Appellant arrive at the house, stay for five to ten minutes, and then leave. Brown returned to where Diaz was waiting in his patrol car and gave Diaz a plastic bag with a white rock substance in it. Diaz field tested the substance, which indicated the presence of cocaine. A subsequent lab test confirmed the result.

Following Diaz's testimony, the State planned to call Brown as a witness. But before calling Brown, the State requested that a spectator, Appellant's brother Jerry Williams, be temporarily excluded from the courtroom during Brown's testimony. The State contended that it had "credible and reliable information" that Williams's presence would intimidate Brown, which would affect his testimony. The State also provided caselaw to the court "supporting closing the courtroom because of the intimidation factor." To minimize the effects of the closure, the State offered to set up a live video feed in another room of the courthouse so that Williams could watch Brown's testimony in real time.

Defense counsel objected to the State's request. Counsel asserted that the State had failed to provide any evidence supporting its claim of witness intimidation and that the State "has to provide specific facts to support that notion[.]" Defense counsel further asserted that Williams's removal would detract from the jury's ability to assess Brown's credibility because one of the ways the jury evaluates credibility is by evaluating the witness while he is "making his claims in open court subject to being observed by whoever

[sic] is in open court." Thus, excluding Williams from the courtroom "would essentially give [Brown] the ability to testify in a consequence-free environment," thereby providing him an "advantage over any other witness." The State countered that only Appellant has a right to confrontation, which is not infringed when a member of the public is excluded from the courtroom. The prosecutor also indicated that, in her experience, confidential informants are often threatened or victimized as a result of their testimony.[3] And, in response to the assertion that the State failed to provide any evidence to support its intimidation claim, the prosecutor reiterated that the witness was a confidential informant. This statement suggested that the State could not (or would not) disclose any specific information regarding its claim of intimidation. The prosecutor emphasized that the State was "not saying that Jerry Williams cannot watch this person testify" and that it does not "violat[e] open court if we let him watch by Skype from another courtroom."[4]

The trial court granted the State's request and overruled Appellant's objection. In its oral findings made on the record, the trial court found that "the State's interest outweighs the defendant's right [ ]  to public scrutiny;" that the exclusion of Appellant's brother was

---

[3] Specifically, the prosecutor stated, "The only reason [Williams] would be sitting in this courtroom is to intimidate a confidential informant. I was the former drug and gang interdiction prosecutor, I have prosecuted capital murder cases where confidential informants were killed and/or intimidated during the course of their testimony and I think there's zero reason behind— behind keeping him in the courtroom."

[4] At another point in the record preceding this discussion, the prosecutor asserted that Appellant's brother was a drug dealer. Specifically, in the course of arguing that the defense should not be permitted to ask the detective about how many cases the CI had done previously, the prosecutor stated, "The problem, Your Honor, is . . . her brother is sitting in the courtroom. He's also a drug dealer and so if we talk about how many cases this CI has done, the risk to his life increases exponentially. . . . There's no reason to talk about how many buys he did for law enforcement." However, the prosecutor did not offer any evidence or testimony showing that Appellant's brother was a drug dealer.

"necessary to protect the confidential informant from intimidation that would traumatize him or render him unable to testify;" and that the exclusion was only "temporary and only for the testimony of the confidential informant[.]" The court further found that it was a "reasonable alternative" for Williams to watch Brown's testimony on a live video stream from another room. After Williams left the courtroom, the State called Brown as a witness and he was brought into the courtroom through a back door "for his safety."

In his testimony before the jury, Brown stated that he had met Appellant through a friend, the two were "[l]ike family," and he loved her "like a sister." He acknowledged that he had purchased drugs from her on multiple occasions. On the date in question, Brown called Appellant and asked her to come over to his house. Upon arrival, she pulled out a white rock, broke it into pieces, and weighed out seven grams. Brown paid Appellant $180 for the substance and then she left. A video and audio recording of the entire transaction captured by Brown's recording device was also admitted into evidence.

After the close of evidence, the jury convicted Appellant of the charged offense, and the trial court assessed her punishment at twenty years' imprisonment.

On appeal, the Fourth Court of Appeals reversed Appellant's conviction, holding that her Sixth Amendment right to a public trial had been violated by her brother's temporary exclusion from the courtroom. *Williams v. State*, No. 04-18-00883-CR, 2020 WL 2543308, at *3 (Tex. App.—San Antonio, May 20, 2020) (not designated for publication). The court first held that the trial court's actions constituted a partial courtroom closure, reasoning that "'[t]he exclusion of even a single person from court proceedings can violate a person's Sixth Amendment right to a public trial.'" *Id.* at *2 (quoting *Turner*

*v. State*, 413 S.W.3d 442, 449 (Tex. App.—Fort Worth 2012, no pet.)). The court proceeded to consider whether the closure was justified under the framework set forth in *Waller,* 467 U.S. 39. *Id.* at *2-3. Recognizing that the fourth factor under *Waller* requires the trial court to make findings adequate to support the closure, the court of appeals determined that this requirement was not met here. *Id.* at *3. Ultimately it concluded that the record "lack[ed] specific factual findings, or any other evidence, identifying how the exclusion of [Appellant's] family member from the courtroom serves the interest advanced by the State of preventing intimidation of the confidential informant." *Id.* Observing that the violation of a defendant's public-trial right is structural error that does not require a showing of harm, the court of appeals reversed Appellant's conviction and ordered a new trial. *Id.*

The State filed a petition for discretionary review, which this Court granted on three grounds to evaluate the court of appeals' analysis of this issue.[5]

## II. Analysis

In its petition for discretionary review, the State raises two broad challenges to the court of appeals' analysis: First, it contends that the lower court erred by failing to

---

[5] The State's grounds for review are as follows:

1) The judge, on an at best, partially developed record, required one spectator to view one witness's testimony contemporaneously from a neighboring room. Is this the sort of closure requiring reversal contemplated by the right to a public trial?
2) Did the Fourth Court of Appeals fail to adequately address petitioner's argument that the courtroom was not closed as required by Rule 47.1 of the Texas Rules of Appellate Procedure?
3) Does the Fourth Court of Appeals' opinion fail to provide proper guidance and risk creating confusion for other courts when it failed to make a clear distinction between full and partial courtroom closures and the standards applicable to each type of closure?

recognize that the physical exclusion of Appellant's brother from the courtroom while still permitting him to view the proceedings on a live video stream did not constitute a true "closure" of the courtroom for Sixth Amendment purposes. Thus, absent a showing that Appellant's trial was actually closed to any member of the public, the State suggests that her claim must fail on this basis. Alternatively, the State argues that, even assuming these circumstances did constitute a closure of the courtroom, they still do not amount to a reversible Sixth Amendment violation. The State notes that the traditional *Waller* test applied by the court of appeals is appropriate when considering a complete courtroom closure wherein the public is excluded entirely from a proceeding. But here, there was, at best, only a partial closure. Appellant's brother was the only person physically excluded, and he was virtually included and able to view the proceedings in real time via the live video feed. Thus, the State contends that these circumstances do not implicate the same secrecy and fairness concerns as a complete courtroom closure. Instead, it suggests that these circumstances call for a modified, less stringent Sixth Amendment analysis. Under that less stringent standard, the State contends that Appellant's Sixth Amendment right to a public trial was not violated and that reversal of her conviction is not warranted.

Because we find the State's second argument to be dispositive, we focus our analysis on that issue and assume without deciding that the circumstances here constituted a partial closure of the courtroom. With respect to the State's second argument, given that we have not previously considered whether a modified Sixth Amendment analysis should

apply in some situations involving a less-than-complete closure of the courtroom,[6] we look to decisions from other jurisdictions to guide our analysis. Based on our review of the caselaw, we find that a modified Sixth Amendment analysis should apply here. Thus, strict application of the traditional *Waller* factors is unnecessary. But, we note that other jurisdictions have adopted at least two approaches to examining partial or trivial closures in this context. Which of the less-stringent analyses should apply here?

### A.      Standard of Review

The question of whether a defendant's Sixth Amendment right to a public trial was violated is a mixed question of law and fact that does not turn on credibility and demeanor. *Cameron v. State*, 490 S.W.3d 57, 70 (Tex. Crim. App. 2016) (op. on reh'g). In conducting this review, an appellate court must first defer to the trial court's findings of fact that are supported by the record. *Id.* The court must then resolve on a *de novo* basis: (1) "whether a defendant met [her] burden to show [her] trial was closed to the public based on the totality of the evidence, and then [(2)] the ultimate legal question of whether [her] public-trial right was violated." *Id.*

### B.      General Sixth Amendment Public-Trial Right Principles

---

[6] In two previous decisions, we have recognized the existence of authority from other jurisdictions addressing this issue, but we have never before directly considered whether it would be appropriate to deviate from the traditional *Waller* test under some circumstances. *See Cameron*, 490 S.W.3d at 68 (noting that "[s]ome courts have applied a less stringent test for 'partial' or 'trivial' closures, where members of the public are temporarily excluded from the courtroom," and citing federal precedent in support); *Steadman v. State*, 360 S.W.3d 499, 505 n.19 (Tex. Crim. App. 2012) (recognizing that "[s]ome courts, both state and federal, have held that the Sixth Amendment test laid down in *Waller* need be less stringent in the 'partial' closure context," but declining to apply that standard because *Steadman* involved a complete courtroom closure) (citation and quotations omitted).

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" U.S. CONST. amend. VI. This provision is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *In re Oliver*, 333 U.S. 257, 273 (1948).[7] "A public trial is a trial which is open to the general public at all times." *People v. Woodward*, 841 P.2d 954, 956 (Cal. 1992). It is "one that is not secret; it is one that the public is free to attend." *People v. Jones*, 464 P.3d 735, 740 (Colo. 2020).

In examining the purposes underlying the Sixth Amendment right to a public trial, the Supreme Court has explained that this right is "'for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.'" *Waller*, 467 U.S. at 46 (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979)).[8] Further, "[i]n addition to ensuring that [the] judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury." *Id*. However, the right to an open trial is not

---

[7] Further, Article I, § 10, of the Texas Constitution guarantees the accused in all criminal prosecutions the right to a "speedy public trial." TEX. CONST. art. I, § 10. This Court has observed that this language is "practically the same" as the language of the Sixth Amendment. *Price v. State*, 496 S.W.2d 103, 107 (Tex. Crim. App. 1973). In any event, the parties' arguments in this case focus on the Sixth Amendment right to a public trial under the federal Constitution and do not claim that it differs from the right under the Texas Constitution. Similarly, the court of appeals addressed only the Sixth Amendment right. Therefore, we base our analysis on the Sixth Amendment and do not address the nearly identical provision in the Texas Constitution.

[8] *See also Gannett*, 443 U.S. at 383 ("[T]here is a strong societal interest in public trials. Openness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously, and generally give the public an opportunity to observe the judicial system.").

absolute and "may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Id.* at 45; *see also Lilly v. State,* 365 S.W.3d 321, 328 (Tex. Crim. App. 2012) ("The right to a public trial is not absolute and may be outweighed by other competing rights or interests, such as interests in security, preventing disclosure of non-public information, or ensuring that a defendant receives a fair trial."). "Such circumstances will be rare," and the "balance of interests must be struck with special care." *Waller,* 467 U.S. at 45. Given the weighty interests at stake and the difficulty of assessing harm under these circumstances, a violation of the right to a public trial is structural error not subject to harmlessness review. *Id.* at 49; *see also Lilly*, 365 S.W.3d at 328 (recognizing that violation of public-trial right is structural error).

In *Waller*, the Supreme Court addressed a situation involving a complete closure of the courtroom to the public. *Waller*, 467 U.S. at 42. There, a seven-day hearing on a motion to suppress evidence was closed to the public entirely. *Id.* The rationale for the closure was that some of the evidence to be admitted at the hearing, wiretap evidence relating to a gambling scheme, was confidential and might be tainted if heard by the public in open court. *Id*. at 41-42. Ultimately, the wiretap communications comprised less than two-and-a-half hours of the evidence presented during the seven-day suppression hearing. *Id.* at 42. Thus, the question before the Supreme Court was whether the complete closure of the entire seven-day hearing was justified based on the minimal amount of confidential evidence that had been admitted. *Id.* at 43. In examining the Sixth Amendment question before it, the Court generally observed that:

The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Id.* at 44 (quoting *Press Enterprise Co. v. Superior Ct.*, 464 U.S. 501, 510 (1984)). The Court then articulated a four-factor analysis for determining whether a courtroom closure violates a defendant's Sixth Amendment public-trial right:

[(1)] the party seeking to close the [trial] must advance an overriding interest that is likely to be prejudiced, [(2)] the closure must be no broader than necessary to protect that interest, [(3)] the trial court must consider reasonable alternatives to closing the proceeding, and [(4)] it must make findings adequate to support the closure.

*Id.* at 48.

Applying those factors, the Court held that "the closure of the entire suppression hearing plainly was unjustified." *Id.* at 48. Specifically, although it recognized that privacy concerns might justify closing portions of a suppression hearing to the public, it reasoned that the State's proffer "was not specific" enough to establish the claimed privacy interests and how they might be infringed. *Id.* It further reasoned that the trial court's findings were too "broad and general" to justify closure of the entire hearing. *Id.* The Court also observed that the trial court did not consider alternatives to complete closure such as closing only a portion of the hearing. *Id.* Thus, it concluded that a Sixth Amendment violation had occurred, and it ordered a new suppression hearing.

This Court has interpreted *Waller* as requiring a two-step test. *Lilly*, 365 S.W.3d at 329; *Cameron*, 490 S.W.3d at 68-69. In the first step, we determine whether a trial was, in fact, closed to the public. *Lilly*, 365 S.W.3d at 329. The defendant bears the initial burden

under this first step to show that her trial was closed to the public; if she "fails to carry that burden, the analysis is concluded." *Cameron,* 490 S.W.3d at 69. If, on the other hand, the defendant succeeds in making such a showing, then we proceed to the second step, which asks us to determine whether the closure was proper under the four factors from *Waller* described above. *Id.* at 68; *see also Lilly*, 365 S.W.3d at 329. In *Lilly*, we explained that the trial court's findings are the "linchpin" of this second step and "must be on the record and specific." *Lilly*, 365 S.W.3d at 329 ("Proper findings will identify the overriding interest and how that interest would be prejudiced, why the closure was no broader than necessary to protect that interest, and why no reasonable alternatives to closing the proceeding existed.").

### C. Partial Versus Complete Courtroom Closures

As noted above, *Waller* addressed a complete courtroom closure wherein the public was excluded entirely from the lengthy pretrial proceedings at issue there. However, numerous other courts have recognized a lesser type of closure, termed a "partial closure," that occurs when a courtroom remains open to some members of the public but is closed to others. *See, e.g., United States v. Simmons*, 797 F.3d 409, 413 (6th Cir. 2015) ("Nearly all federal courts of appeals [ ] have distinguished between the total closure of proceedings and situations in which a courtroom is only partially closed to certain spectators."); *Garcia v. Bertsch*, 470 F.3d 748, 752 (8th Cir. 2006) ("Many courts . . . have distinguished the complete closure in *Waller* from partial closures."). "Whether a closure is total or partial . . . depends not on how long a trial is closed, but rather [on] who is excluded during the period of time in question." *United States v. Thompson*, 713 F.3d 388, 395 (8th Cir. 2013).

Thus, whereas "a total closure involves excluding all persons from the courtroom for some period [ ] a partial closure involves excluding one or more, but not all, individuals for some period." *Simmons*, 797 F.3d at 413.

In examining the appropriate Sixth Amendment analysis that should apply in situations of partial closure, courts have recognized that such closures do not implicate the same secrecy and fairness concerns that accompany a complete closure of the courtroom. *Woods v. Kuhlmann*, 977 F.2d 74, 76 (2d Cir. 1992); *see also United States v. Osborne*, 68 F.3d 94, 98–99 (5th Cir. 1995) (stating that partial closure "does not raise the same constitutional concerns as a total closure, because an audience remains to ensure the fairness of the proceedings").  Thus, the "'impact of [a partial] closure is not as great, and not as deserving of such a rigorous level of constitutional scrutiny,'" as a total closure. *Simmons*, 797 F.3d at 413 (quoting *Judd v. Haley*, 250 F.3d 1308, 1316 (11th Cir. 2001)). Given this distinction, many courts have applied a modified version of the *Waller* test to partial closures.

In the modified *Waller* test applicable to partial closures, courts replace the first *Waller* factor, which ordinarily requires an "overriding interest" to support complete closure of the courtroom, with a less stringent "substantial reason" or "substantial interest" test. *See id.* at 414 (noting that in Sixth Circuit Court of Appeals, for situations involving partial closure, a less stringent "substantial reason" test replaces the first *Waller* factor that ordinarily requires an "overriding interest;" other three *Waller* factors remain the same); *Bucci v. United States*, 662 F.3d 18, 23 (1st Cir. 2011) (explaining that First Circuit and others require only a "substantial interest" rather than a "compelling" one in partial closure

cases); *Osborne*, 68 F.3d at 98-99 (noting that at least five other federal circuit courts "have all found that *Waller*'s stringent standard does not apply to partial closures, and have adopted a less demanding test requiring the party seeking the partial closure to show only a 'substantial reason' for the closure," and adopting that test in the Fifth Circuit).[9]

Aside from modifying the first *Waller* factor by reducing the significance of the asserted interest at stake, the remaining three *Waller* factors remain in full effect. Thus, under this modified *Waller* test for partial closures, in addition to finding: (1) a "substantial reason" for the closure that is likely to be prejudiced if no closure occurs, a court must still ensure that: (2) the closure was no broader than necessary; (3) the trial court considered reasonable alternatives to closure; and (4) the record contains factual findings adequate to support the closure. *Simmons*, 797 F.3d at 414; *see also Waller*, 467 U.S. at 48. In applying this modified *Waller* test, courts have reached a variety of holdings, many of which largely hinge on the adequacy of the trial court's findings and the facts in the record to support the closure. *Compare Simmons,* 797 F.3d at 414-15 (concluding that Sixth Amendment was violated where trial court excluded three co-defendants from courtroom during testimony of witness to prevent intimidation; the record was insufficient to support closure because the trial court "asked no questions at all" to verify prosecution's claim of witness

---

[9] A minority of jurisdictions have declined to apply a less rigorous "substantial reason" test for partial closures. *See, e.g., People v. Jones*, 750 N.E.2d 524, 529 (N.Y. 2001) (declining to apply less stringent standard for partial closures because *Waller* "already contemplates a balancing of competing interests"); *Tinsley v. United States*, 868 A.2d 867, 874 (D.C. 2005) (declining to apply "substantial reason" standard and stating, "[W]e are not persuaded that the distinction between a 'substantial reason' and an 'overriding interest' is a particularly meaningful one."); *State v. Mahkuk*, 736 N.W.2d 675, 685 (Minn. 2007) ("Although some federal circuit courts of appeals apply a lesser 'substantial reason' test to review the constitutionality of partial closures, we have not applied different tests to complete versus partial closures.").

intimidation and instead simply relied on prosecutor's vague assertions), *with Nieto v. Sullivan,* 879 F.2d 743, 753 (10th Cir. 1989) (holding that partial closure did not violate Sixth Amendment where defendant's relatives were excluded from the courtroom during the complaining witness's testimony; the trial judge had "a substantial reason for the closure" in seeking to prevent witness intimidation, and the record supported that determination because judge interviewed witness *in camera* and verified basis for his fear).[10]

### D.    Trivial or *De Minimis* Closures

In addition to the modified *Waller* test described above, many jurisdictions have also adopted a distinct approach for situations involving closures deemed so "trivial" or *de minimis* as to not implicate the Sixth Amendment public-trial right at all. *See, e.g., Peterson v. Williams*, 85 F.3d 39, 40 (2d Cir. 1996) ("[E]ven an unjustified closure may, on its facts, be so trivial as not to violate" the Sixth Amendment); *People v. Lujan*, 461 P.3d 494, 499 (Colo. 2020) (noting that "many jurisdictions have held that some closures are simply so trivial that they do not rise to the level of a constitutional violation," and adopting such approach in Colorado).[11] In those situations, rather than focusing on whether a closure was

---

[10] *See also Thompson,* 713 F.3d at 396 (applying modified *Waller* test for partial closures and holding that no Sixth Amendment violation resulted from exclusion of defendant's family members during testimony of one witness at sentencing; "Considering the record before the district court, which laid out [the witness's] expressed fear of testifying against [the defendant] . . . we find no abuse of discretion[.]"); *Woods*, 977 F.2d at 76-78 (applying modified *Waller* test and concluding that no Sixth Amendment violation resulted from exclusion of family members during testimony of one witness at trial; trial court had a substantial reason for excluding defendant's family members during witness's testimony where witness expressed that she was afraid to testify in front of them).

[11] The Second, Third, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, and D.C. Circuits have endorsed this approach. *See, e.g.*, *United States v. Cervantes*, 706 F.3d 603, 611–12 (5th Cir. 2013); *United*

justified, as the *Waller* test does, courts instead evaluate as a preliminary matter "whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant . . . of the protections conferred by the Sixth Amendment." *Peterson*, 85 F.3d at 42; *see also United States v. Perry*, 479 F.3d 885, 890 (D.C. Cir. 2007) ("A courtroom closing is 'trivial' if it does not implicate the 'values served by the Sixth Amendment' as set forth in *Waller*.").

To assess whether a closure was trivial, courts look to whether the circumstances implicated the "values furthered by the public trial guarantee;" namely, "1) to ensure a fair trial; 2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; 3) to encourage witnesses to come forward; and 4) to discourage perjury." *Peterson*, 85 F.3d at 43; *see also Waller*, 467 U.S. at 46-47. If the closure did not jeopardize or subvert these values, then it is deemed too trivial to amount to a Sixth Amendment violation, and further analysis under the *Waller* factors becomes unnecessary. In evaluating triviality, courts should examine the totality of the circumstances and consider factors such as "the duration of the closure, the substance of the proceedings that occurred during the closure, whether the proceedings were later memorialized in open court or placed on the record, whether the closure was intentional,

---

*States v. Arellano-Garcia*, 503 F. App'x 300, 305 (6th Cir. 2012); *United States v. Greene*, 431 F. App'x 191, 197 (3d Cir. 2011); *United States v. Izac*, 239 F. App'x 1, 4 (4th Cir. 2007); *United States v. Perry*, 479 F.3d 885, 890–91 (D.C. Cir. 2007); *Carson v. Fischer*, 421 F.3d 83, 92 (2d Cir. 2005); *United States v. Ivester*, 316 F.3d 955, 960 (9th Cir. 2003); *Braun v. Powell*, 227 F.3d 908, 920 (7th Cir. 2000); *United States v. Al-Smadi*, 15 F.3d 153, 154–55 (10th Cir. 1994). Various state courts have also adopted this approach. *See, e.g., State v. Smith*, 876 N.W.2d 310, 329 (Minn. 2016); *State v. Telles*, 446 P.3d 1194 (N.M. Ct. App. 2019) (stating that there is a "uniform line of authority holding that a courtroom closure that is determined to be trivial does not meaningfully infringe upon the values protected by the right to a public trial"); *State v. Turcotte*, 239 A.3d 909 (N.H. 2020).

and whether the closure was total or partial." *Lujan*, 461 P.3d at 498-99. Applying these considerations, courts have frequently held that inadvertent or brief closures, or the exclusion of a single spectator, are too trivial to implicate the Sixth Amendment.[12] On the other hand, courts have held that closures are not trivial where they are less fleeting, are longer in duration, or exclude individuals during a key witness's testimony.[13] Ultimately, the triviality assessment must be made under the totality of the circumstances, and no bright-line rules apply. Moreover, the standard should be applied sparingly. *See United States v. Gupta*, 699 F.3d 682, 688 (2d Cir. 2012) (emphasizing triviality doctrine's "narrow application").

      E.      **Applying the triviality doctrine here, there was no reversible Sixth Amendment violation because based on the specific facts, the presumptive closure did not implicate any of the values sought to be protected by the Sixth Amendment.**

---

[12] *See, e.g., Carson,* 421 F.3d at 85 (concluding that trial court's exclusion of defendant's ex-mother-in-law from a portion of the trial while failing to make particularized findings did not implicate the values underlying the Sixth Amendment); *United States v. Ivester*, 316 F.3d 955 (9th Cir. 2003) (holding that brief mid-trial closure to question jurors about safety concerns was trivial); *Peterson*, 85 F.3d at 44 (holding that where closure was "1) extremely short, 2) followed by a helpful summation [of the evidence], and 3) entirely inadvertent," the closure was trivial and thus "the defendant's Sixth Amendment rights were not breached"); *United States v. Al-Smadi*, 15 F.3d 153, 154-55 (10th Cir. 1994) (concluding that closure, which was "brief and inadvertent," "unnoticed by any of the trial participants," and occurred only once, did not violate defendant's public-trial rights); *Perry*, 479 F.3d at 890 (holding that intentional exclusion of defendant's minor son for entirety of trial was trivial).

[13] *See, e.g., People v. Hassen*, 351 P.3d 418, 422 (Colo. 2015) (finding that total closure of courtroom during two witnesses' testimony was not trivial); *United States v. Rivera*, 682 F.3d 1223, 1230 (9th Cir. 2012) (holding that exclusion of defendant's family members from sentencing hearing was not trivial); *State v. Ndina*, 761 N.W.2d 612 (Wis. 2009) (finding that exclusion of most of defendant's family for three days of testimony not trivial); *Gonzalez v. Quinones*, 211 F.3d 735 (2d Cir. 2000) (holding that intentional closure during key witness's testimony that lasted entire morning not trivial); *Jones*, 464 P.3d at 744 (finding that exclusion of defendant's parents during testimony of two key witnesses spanning afternoon of trial was not trivial).

Considering the three analytical frameworks discussed above (the traditional *Waller* "overriding interest" test, the modified "substantial reason" test for partial closures, or the triviality doctrine), we conclude that the triviality doctrine is the appropriate framework for resolving Appellant's claim. That is because the exclusion here was: (1) solely the physical exclusion of a single witness while allowing for his virtual inclusion via the live stream from a neighboring courtroom; (2) for the testimony of only one witness which was brief; and (3) for testimony which was supported by an audio and video recording that was admitted into evidence.

As we have explained above, the core rationale underlying the triviality doctrine is that some circumstances amount to such a trivial or *de minimis* closure that the values sought to be protected by the Sixth Amendment are simply not implicated. *See Peterson*, 85 F.3d at 42; *Perry*, 479 F.3d at 890. The relevant values are: 1) ensuring that the defendant receives a fair trial; 2) reminding the prosecutor and judge of their responsibility to the accused and the importance of their functions; 3) encouraging witnesses to come forward; and 4) discouraging perjury. *Peterson*, 85 F.3d at 43; *Waller*, 467 U.S. at 46-47. If none of these core values are meaningfully affected by the closure, it is unnecessary to require extensive justification, record support, and factual findings to validate the trial court's actions under either the traditional or modified *Waller* tests. It would also be unjust to reverse a conviction based on a deficiency in the record or findings to support closure where no actual infringement of the defendant's public-trial right has occurred. Thus, while we recognize and reaffirm that *Waller* is the prevailing test for evaluating whether a Sixth Amendment public-trial violation has occurred, it is not applicable in all circumstances.

On a case-by-case basis, it may be appropriate to conduct a preliminary inquiry into the nature of the closure to determine whether it implicates Sixth Amendment values at all. For reasons explained below, we conclude that to the extent there was a closure here, it was trivial and it is therefore unnecessary to scrutinize the trial court's actions under *Waller*.

1. **Appellant received a fair trial.**

With respect to the first value, ensuring a fair trial, while Appellant's brother was briefly physically excluded from the courtroom, he was virtually included by having the ability to view the proceedings in real time from a nearby room. This fact neutralizes the fairness and secrecy concerns that would otherwise arise when a spectator is excluded from the courtroom. Indeed, this singular circumstance sets this case apart from the vast majority of Sixth Amendment courtroom-closure cases cited above in which the excluded individual had no opportunity to view the proceedings. Although we recognize that there may be an infringement on the fairness of the proceedings where a defendant's family member is excluded during the testimony of even a single witness, we cannot say the same is true here where Appellant's brother was able to hear and view Brown's testimony via the livestream. Because Appellant's brother was virtually included, he had the ability to contemporaneously monitor the proceedings to ensure that Appellant was "fairly dealt with and not unjustly condemned[.]" *Waller*, 467 U.S. at 46 (quoting *Oliver*, 333 U.S. at 270 n.25).[14]

---

[14] We note that one factor often cited by courts in evaluating the triviality of a closure is whether the proceedings were "later memorialized in open court or placed on the record." *Lujan*, 461 P.3d at 499. By way of analogy here, the livestream provided the equivalent of a transcript *in real time*. Thus, the situation here is far less egregious than other situations in which an excluded individual has no opportunity to learn of the substance of the proceedings until long after the fact.

**2.       The trial participants were "keenly alive to a sense of their responsibility and to the importance of their functions," because they knew that Appellant's brother was in a nearby room watching Brown testify.**

With respect to the second value, keeping the trial participants "keenly alive to a sense of their responsibility and to the importance of their functions," *see id*., we note that the judge and attorneys were aware that Appellant's brother was viewing the proceedings remotely in a nearby room. Given this awareness, the mere physical absence of Appellant's brother from the courtroom did not negatively impact this goal when all the relevant parties knew of the livestream arrangement.

**3.       There was nothing about the arrangement that would have discouraged witnesses from coming forward.**

With respect to the third goal—encouraging witnesses to come forward—we note that Appellant's brother was not a witness to the drug transaction. Even if Appellant's brother had personal knowledge about any matters involved at trial, if he observed issues with Brown's testimony, he was fully capable of bringing such issues to the immediate attention of defense counsel and offering to rebut Brown's testimony with his own version of events. There is nothing to suggest that any other witness was discouraged from coming forward based on the livestream arrangement.

**4.       There is little to no risk that the physical absence of Appellant's brother in the courtroom encouraged perjury.**

The drug transaction at issue was recorded with video and audio. The video evidence was played for the jury. Brown's testimony mostly provided additional context for what the jury observed in the video evidence. In fact, Brown's testimony was brief, spanning only fifteen pages of the reporter's record. Thus, introduction of the video

evidence reduced the importance of Brown's testimony overall. Further, Brown testified in a fully open courtroom in the physical presence of Appellant and other spectators. While it is unclear whether Brown knew Appellant's brother was viewing the testimony remotely, under the totality of the circumstances we cannot discern any marginal increase in the risk of Brown perjuring himself on the basis of the livestream arrangement.

After analyzing the circumstances in light of the four triviality doctrine factors, we find that there was no meaningful infringement on any Sixth Amendment values as a result of the livestream arrangement. Therefore, there is no constitutional violation and further analysis under *Waller* is unnecessary. *See Zornes v. Bolin*, 37 F.4th 1411, 1418 (8th Cir. 2022) (holding that situation where spectator was excluded from courtroom but permitted to view proceedings remotely from observation room was too trivial to implicate Sixth Amendment).[15] In reaching this holding, we emphasize that this approach constitutes an exceedingly narrow exception to the broad applicability of *Waller,* which remains the primary framework for analyzing courtroom closures under the Sixth Amendment. We further reiterate that trial courts should consider the *Waller* factors before excluding anyone from a courtroom.

### F.      Response to the Concurring and Dissenting Opinions

---

[15] Specifically, in *Zornes* the Eighth Circuit Court of Appeals denied federal habeas relief under similar circumstances by upholding a determination of the Minnesota Supreme Court finding no Sixth Amendment violation under the triviality doctrine. *Zornes*, 37 F.4th at 1418. There, the trial court had intentionally excluded the victim's brother from voir dire to prevent contact between him and prospective jurors, but the court permitted him to observe the proceedings remotely in a nearby room. *Id.* In finding that the Minnesota court had not engaged in an unreasonable application of federal law by rejecting a Sixth Amendment claim under these circumstances, the Eighth Circuit reasoned that the excluded individual "was able to observe jury selection from an observation area, and [the defendant] does not explain how that remote viewing by one spectator undermined the values furthered by the constitutional guarantee of a public trial." *Id.*

In contrast to our approach above, it has been suggested by both the concurring and dissenting opinions that we should reject the triviality doctrine and instead apply the *Waller* test here. Specifically, the dissenting opinion urges that we should apply the traditional *Waller* "overriding interest" test and hold that the trial court's factual findings were inadequate to justify the closure. The concurring opinion suggests that we should apply the modified *Waller* "substantial reason" test and hold that the record *is* adequate to satisfy this test. Although our reasons for disagreeing with these approaches are likely apparent from our analysis above, we will briefly expand on our rationale here.

First, with respect to the suggestion by the dissenting opinion that we are bound to strictly adhere to the *Waller* "overriding interest" test here, we disagree. As we have already noted above, the Supreme Court in *Waller* addressed a complete closure of a seven-day suppression hearing. Because of this distinction, numerous courts, including the Fifth Circuit, have concluded that *Waller* does not apply with full force outside the context of a complete closure. *See, e.g., Osborne*, 68 F.3d at 98-99 (noting that the Fifth Circuit along with several other federal circuit courts "have all found that *Waller's* stringent standard does not apply to partial closures, and have adopted a less demanding test."); *Garcia,* 470 F.3d at 752 ("Many courts, including this one, have distinguished the complete closure in *Waller* from partial closures."). The dissent provides no persuasive explanation for why it disagrees with the majority of jurisdictions that have departed from *Waller* under these circumstances. Further, the Supreme Court has never directly addressed what standard should apply when a single spectator is excluded from the courtroom, let alone considered a situation wherein the physically excluded individual was virtually included through a

livestream arrangement. Nor has it ever rejected the triviality doctrine, which has been in existence for more than twenty years. In short, we are unpersuaded by the dissent's position that we are bound to adhere to the "strict" dictates of *Waller* under these clearly distinguishable circumstances. Indeed, the dissent scarcely affords any weight to the fact that Appellant's brother was virtually included, and instead seeks to align this case with the more typical courtroom-closure cases in which a person is completely excluded from the proceedings with no immediate recourse and no ability to know what is transpiring behind closed doors. *See* diss. op., at 8-9 (discussing *Steadman*, 360 S.W.3d at 500).

The dissent also dismisses the triviality doctrine, in part, by reasoning that it is nothing more than a harm analysis, which is inapplicable in the context of a Sixth Amendment public-trial claim. But this observation reflects a misunderstanding of how a triviality analysis should function. As the Second Circuit Court of Appeals explained in *Peterson*:

> A triviality standard, properly understood, does not dismiss a defendant's claim on the grounds that the defendant was guilty anyway or that he did not suffer "prejudice" or "specific injury." It is, in other words, very different from a harmless error inquiry. It looks, rather, to whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant—whether otherwise innocent or guilty—of the protections conferred by the Sixth Amendment.

85 F.3d at 42. Thus, the triviality doctrine is a preliminary inquiry that focuses solely on the nature of the trial court's actions and whether they in any way jeopardized the values underlying the public-trial right. If as here, no such values were jeopardized, then no constitutional violation has occurred. When there is no constitutional violation, then there is no need for a harmless error analysis, because there is no error. It is also not appropriate

to proceed to the second step of *Waller*, which focuses on whether the trial court's actions in infringing upon Sixth Amendment values were justified, when no such infringement has occurred in the first place.

Turning to the concurrence, it similarly suggests that we should apply *Waller* here, but it would adopt the modified "substantial reason" test in lieu of the more traditional test urged by the dissent. Nevertheless, like the dissent, the concurrence affords almost no analytical significance to the defining feature of this case—that the livestream arrangement permitted Appellant's brother to *actually view the proceedings* in real time. In support of its position, the concurrence cites two cases and says they are "directly analogous" to this case—*Tinsley v. United States*, 868 A.2d 867, 876 (D.C. Cir. 2005), and *State v. Mahkuk*, 736 N.W.2d 675, 685 (Minn. 2007). While both cases involved the physical exclusion of a defendant's family member from the courtroom, that is where the similarity to this case ends. Neither case involved a situation where the physically-excluded individual was virtually included and was permitted to observe the proceedings remotely in real time. The concurrence wholly fails to account for the significance of the brother's virtual inclusion. Indeed, it does not cite a single case applying *Waller* under such similar circumstances.

The concurrence also suggests that we have misconstrued the authority applying the triviality doctrine. That is incorrect. While the doctrine was originally devised in the context of an inadvertent closure, *see Peterson*, 85 F. 3d at 40, the doctrine has expanded in scope to include even a narrow class of intentional closures. The inadvertence of a closure is but one factor to consider amongst the totality of the circumstances in evaluating

whether a closure is trivial.[16] Further, as we have already stated, while there are no bright-line rules in this context, the triviality doctrine should be employed only in narrow circumstances. To the extent the concurrence believes that our holding means that all partial closures are trivial, thereby allowing courts to routinely bypass the *Waller* requirement of an overriding or substantial interest, that is not our holding. On the contrary, we can envision that the vast majority of partial closures will not be trivial and will require full analysis under *Waller*. It is only unusual situations, such as this one, that may fall under the triviality framework.

Finally, though we do not engage in our own analysis under *Waller* here for obvious reasons, we find it necessary to point out the ways in which the concurrence's proposed approach may actually undermine the public-trial right in practice. The concurrence suggests that the conviction in this case should be upheld even though the State made a "paltry" showing that permitting Appellant's brother to remain in the courtroom would have prejudiced a substantial interest.[17] In essence, the concurrence appears to

---

[16] *See, e.g., Lujan*, 461 P.3d at 498-99.

[17] The State's identified interest here was preventing witness intimidation, which has routinely been identified as both an overriding and substantial interest that can support a partial closure. *See, e.g., Simmons*, 797 F.3d at 414 (noting that courts "consistently hold that ensuring witness safety and preventing intimidation constitutes a substantial reason to justify the partial closure of the courtroom); *Tinsley*, 868 A.2d at 875 (recognizing that "protection of witnesses and avoidance of intimidation [are] overriding interests that may justify the closure of a criminal proceeding"). Here, were we to undertake a full *Waller* analysis, we would be inclined to agree with the dissent's view that, given the lack of facts in the record beyond the prosecutor's bare assertions alleging witness intimidation, the State failed to demonstrate how this interest would have been prejudiced by allowing Appellant's brother to remain in the courtroom. *See, e.g., Mahkuk*, 736 N.W.2d at 685 (applying *Waller* and holding that record and findings were inadequate to establish claim of witness intimidation; prosecutor's general assertion that witness was intimidated by defendant's family members was inadequate to justify closure because "there is no evidence from any witness asserting that a witness had been intimidated or threatened," and the "prosecutor's assertions [ ] are not evidence"). While we recognize that the circumstances suggested that the relationship

acknowledge, without expressly saying so, that the equities in this case do not weigh in favor of reversing the conviction (presumably because it believes there was no actual unfairness or unreasonableness inherent in the trial court's actions). So, to avoid a windfall to the defendant, it implicitly proposes watering down *Waller*'s requirement of specific findings and record support for the closure to hold that these facts are adequate to meet the modified *Waller* test. Our concern with this approach is that, in future cases involving non-trivial closures where the values underlying the Sixth Amendment are actually implicated, courts may interpret the concurrence's approach as relaxing *Waller*'s requirement of specific, on-the-record findings. *See Lilly*, 365 S.W.3d at 329 (explaining that trial court's findings are the "linchpin" of *Waller*'s second step and "must be on the record and specific"). We decline to adopt such an approach that may ultimately impede the proper application of *Waller* to legitimate Sixth Amendment claims. Contrary to the concurrence's suggestion, the triviality standard is precisely well-suited for these circumstances where the nature of the closure itself is too minimal to justify finding a Sixth Amendment violation, but the record is arguably inadequate to satisfy the strict requirements of *Waller*. In short, we will not elevate form over function here and water down the essential requirements of *Waller* to accomplish the correct outcome.

## III. Conclusion

In sum, under the totality of the circumstances presented here, and assuming that a partial closure of the courtroom occurred, we conclude that such closure, if any, was *de*

---

between the witness and Appellant's family and the witness's status as a CI might lead to such intimidation, there were no other facts directly supporting the State's claim of intimidation, and the trial court made only conclusory findings in this regard.

*mimimis* or trivial and did not undermine the values furthered by the public-trial guarantee. Specifically, because the exclusion involved only a single individual during the testimony of one witness; the physically-excluded individual was virtually included and at all times able to view the testimony remotely; and the record does not reveal or even suggest any detrimental effects on the values served by the Sixth Amendment as a result of this arrangement, we conclude that no constitutional violation occurred. In reaching this holding, we emphasize that this approach should be sparingly employed in Sixth Amendment cases only under the narrowest of circumstances. Thus, in the vast majority of cases, *Waller* remains the appropriate inquiry, and trial courts should continue to apply the *Waller* factors with rigor before considering any closure of a courtroom. Because our approach requires consideration of the totality of the circumstances to determine whether a partial closure is trivial, it would be inappropriate for us to provide additional guidance in the absence of specific facts. Thus, we leave to courts hearing future cases with different facts the task of drawing the outer boundaries of what may constitute a trivial closure. Ultimately, given the particular facts presented here, we conclude that Appellant's constitutional rights were not infringed upon. Therefore, we reject the court of appeals' conclusion finding that these facts amounted to a Sixth Amendment violation and reverse its judgment. Because the lower court did not address all the issues raised by Appellant on appeal, we remand this case to the court of appeals for further proceedings.

DELIVERED: September 28, 2022
PUBLISH