22CA0824 Peo v Sandoval 10-30-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA0824
City and County of Denver District Court No. 20CR2989
Honorable Christopher J. Baumann, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Edward R. Sandoval,

Defendant-Appellant.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE FREYRE
Pawar and Yun, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 30, 2025

---

Philip J. Weiser, Attorney General, Brittany Limes Zehner, Senior Assistant
Attorney General and Assistant Solicitor General, Denver, Colorado, for
Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Emily Hessler, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Edward R. Sandoval, appeals the judgment of conviction entered after a jury found him guilty of second degree murder. We reverse the judgment and remand the case for a new trial.

## I.    Background

¶ 2    In 2020, Sandoval shot and killed his mother's boyfriend, Dennis Lozoya. At the time, Sandoval was living in his mother's basement with his young daughter and his girlfriend. During a family barbecue, Sandoval and his girlfriend got into an argument in the basement. Lozoya came downstairs and told Sandoval's girlfriend to leave. Lozoya remained in the basement with Sandoval and started arguing with him.

¶ 3    Moments later, Sandoval's mother and girlfriend saw Lozoya come upstairs and take something from a kitchen drawer. According to their testimony, they both believed it was a gun. Other witnesses testified that when Lozoya came upstairs, he said Sandoval had threatened to shoot him. Shortly thereafter, Sandoval came upstairs brandishing a gun, prompting Sandoval's girlfriend to run into the pantry to hide.

¶ 4     Sandoval's mother testified that Lozoya entered the kitchen visibly angry and threatened her, Sandoval's daughter, and Sandoval's girlfriend with a gun. Sandoval's mother also testified that she heard Sandoval say, "[P]ut the gun down," before firing. Sandoval then shot Lozoya fifteen times, killing him.

¶ 5     After the shooting, Sandoval's mother told everyone to get out of the house. Sandoval gave his daughter to his sister and fled to his aunt's house. He admitted to shooting Lozoya and later turned himself in to the police.

¶ 6     The State charged Sandoval with first degree murder under section 18-3-102(1)(a), C.R.S. 2025. Although a jury acquitted Sandoval of first degree murder, it found him guilty of the lesser included offense of second degree murder. The jury also found he used a semiautomatic assault weapon, which served as a sentence enhancer under section 18-1.3-406(2)(a)(I)(A), C.R.S. 2025. The trial court sentenced Sandoval to forty years in the custody of the Department of Corrections.

¶ 7     Sandoval challenges his conviction on five grounds and his sentence on one ground. He contends that (1) the court violated his Sixth Amendment right to a public trial by excluding all members of

2

the public from jury selection; (2) the court erroneously instructed the jury on the initial aggressor exception to self-defense; (3) the prosecutor committed reversible misconduct during opening statement and closing arguments; (4) the court erroneously ordered discovery of the defense's extraction information from a witness's cell phone; (5) cumulative trial errors require reversal; and (6) there was insufficient evidence to support the sentence enhancer.

¶ 8      We agree with Sandoval's first contention and conclude that the trial court's exclusion of the public from jury selection violated his constitutional right to a public trial.  Accordingly, we reverse the judgment and remand for a new trial.  Because the new trial will proceed on the lesser included offense and the remaining issues are unlikely to arise again, we do not further address them.

## II.      Public Trial

¶ 9      Sandoval contends that his constitutional right to a public trial was violated when the court excluded the public from the courtroom during jury selection due to a lack of space.  We agree.

### A.      Additional Facts

¶ 10      Before trial, both parties requested an "expanded panel" of seventy-five people for voir dire.  The court granted the parties'

request. Due to the expanded panel, thirty-seven potential jurors sat in the courtroom gallery alongside members of the public.

¶ 11 Before jury selection began, the court informed the spectators that they were in a "public courtroom" and that everyone "is welcome to be here," but that once jury selection began, they would need to leave because there was not enough room for both the public and the potential jurors. Both the prosecution and the defense objected to this closure.

¶ 12 The prosecution argued that the exclusion would violate the right to a public trial and urged the court to make findings under *Waller v. Georgia*, 467 U.S. 39, 48 (1984). The defense agreed and argued that the public nature of the proceedings should be preserved. Both parties offered the court alternatives, such as "simulcasting" the voir dire, doing two voir dire sessions, or accommodating the spectators with the potential jury members and instructing both groups not to commingle.

¶ 13 The court disagreed with the parties' proposals and stated as follows:

> We're bringing in 75 jurors. We have 38 up
> front, which means we're going to need 37 in
> the back on a limited number of benches. And

as I count, I think we have 12 members of the public that are in the courtroom right now.

So I will, just for jury selection, broadcast it via Webex. I will make it available publicly via Webex. That's not ideal, perhaps, for some of you. But, most importantly, what I need to do this morning and for the rest of the day is get a jury picked in this case so we can proceed forward with this trial, while at the same time balancing your desire to want to watch this case.

As I stated, generally, there are not a lot of people in the courtroom other than jurors, if any, for jury selection, but that's just not the situation we're in today. So I'm not going with less than 75 jurors, and I'm not going to make 37 jurors sit on one side of the courtroom. There's just not enough space for that to happen.

¶ 14 Voir dire lasted the entire day, and members of the public were not permitted to re-enter the courtroom until the following morning. During voir dire, the court noted that the "Web[e]x is open and available right now for anybody — any member of the public that would like to observe jury selection." The court continued, "I don't see that anybody has logged into Web[e]x yet, but it is open [and the court's] audio and video camera are on."

B.     Standard of Review and Applicable Law

¶ 15     "A trial court's decision to close the courtroom presents a mixed question of law and fact." *People v. Hassen*, 2015 CO 49, ¶ 5.  This means that we accept the trial court's findings of fact absent an abuse of discretion, but we review the court's legal conclusions de novo.  *Rios v. People*, 2025 CO 46, ¶ 17.

¶ 16     Defendants in criminal trials are guaranteed the right to a public trial under both the United States and Colorado Constitutions.  U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16.  The right to a public trial extends to "any stage of a criminal trial," including "the jury selection phase of trial."  *Presley v. Georgia*, 558 U.S. 209, 212-13 (2010).  "[I]n the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process — an essential component in our structure of self-government."  *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 606 (1982).  The right to a public trial instills public confidence in the justice system by allowing the public to see that the court is being fair and that the letter and spirit of the law is being properly discharged.  *See Rios*, ¶ 20.  A violation of the right to a public trial constitutes structural error,

requiring automatic reversal. *See Weaver v. Massachusetts*, 582
U.S. 286, 296 (2017); *Rios*, ¶ 24; *People v. Bialas*, 2025 CO 45, ¶ 9.

¶ 17    While the closure of a physical courtroom may violate a
defendant's right to a public trial, *People v. Jones*, 2020 CO 45,
¶ 27, "the Sixth Amendment is not necessarily violated 'every time
the public is excluded from the courtroom.'" *People v. Lujan*, 2020
CO 26, ¶ 16 (quoting *Peterson v. Williams*, 85 F.3d 39, 40 (2d Cir.
1996)). "[S]ome closures are simply so trivial that they do not rise
to the level of a constitutional violation." *Id.*  In determining
whether a closure was trivial, "courts look to the totality of the
circumstances surrounding the closure." *Id.* at ¶ 19.

> "Factors to be considered [in determining
> triviality] include the duration of the closure,
> the substance of the proceedings that occurred
> during the closure, whether the proceedings
> were later memorialized in open court or
> placed on the record, whether the closure was
> intentional, and whether the closure was total
> or partial."

¶ 18    *Lujan*, ¶ 19.  No one factor is determinative, and other
considerations may also be relevant.  *Id.*

¶ 19    A total closure occurs "when state action prevents the public
from having any reasonable opportunity to observe proceedings

7

contemporaneously in the physical courtroom." *Rios*, ¶ 33. A partial closure occurs "when the state action excludes one or more individuals from the reasonable opportunity to observe the physical courtroom." *Id.* Even if a closure is nontrivial, it does not necessarily mean that a party's right to a public trial was violated because the right itself is not absolute and, at times, must yield to competing interests. *Waller*, 467 U.S. at 45; *Rios*, ¶ 24.

¶ 20     In *Waller*, the Supreme Court set forth a four-part test for courts to apply in deciding whether a courtroom closure complies with the Sixth Amendment. *Rios*, ¶ 24 (citing *Waller*, 467 U.S. at 48.) The *Waller* test requires that (1) "the party seeking to close the [trial proceeding] must advance an overriding interest that is likely to be prejudiced," (2) "the closure must be no broader than necessary to protect that interest," (3) "the trial court must consider reasonable alternatives to closing the proceeding," and (4) "[the trial court] must make findings adequate to support the closure." *Rios*, ¶ 24  (quoting *Waller*, 467 U.S. at 48). A nontrivial closure that does not meet this test is an unconstitutional deprivation of a defendant's right to a public trial that constitutes structural error. *Id.*

¶ 21    Recently, the Colorado Supreme Court decided two public trial cases involving the use of video and audio streaming over a virtual platform.  In *Rios*, a case that was tried during the COVID-19 pandemic, the supreme court held that a virtual platform is not a substitute for public access, but an additional means of access.  *Id.* at ¶ 36.  And when a trial court conducts a trial virtually, a total closure occurs.  *Id.* at ¶ 38.  However, to implicate the public trial right, the closure must be nontrivial.  *Id.*  The court held that conducting an entire trial virtually constituted an intentional and nontrivial closure.  *Id.* at ¶ 40.  But, applying the *Waller* factors, it found no constitutional violation because (1) the public health restrictions justified the closure; (2) the closure was no broader than necessary to comply with the restrictions; (3) there were no other reasonable alternatives to the closure; and (4) the trial court made adequate findings concerning the closure.  *Id.* at ¶¶ 42-49.

¶ 22    In *Bialas*, ¶¶ 3-7, the trial court had removed all spectators from the courtroom midtrial, based on misconduct by some of the spectators, and allowed them to watch the remainder of the trial virtually.  A division of this court reversed the conviction and remanded for a new trial after it determined that the removal was a

9

nontrivial closure that was not justified by the *Waller* factors. *Id.* at ¶¶ 8-9.

¶ 23 The supreme court affirmed and first held that totally excluding the public from the physical courtroom constituted a closure. *Id.* at ¶ 24. The court next held that the closure was intentional and nontrivial because it encompassed more than a half day of a four-day trial. *Id.* at ¶¶ 29-30. The court then applied the *Waller* factors and held that a constitutional violation warranting reversal had occurred. *Id.* at ¶ 31. While recognizing a trial court's ability to control its courtroom, the supreme court found there was no reason to remove the defendant's family (who were not responsible for the disruption) or to close the entire courtroom to the public. *Id.* at ¶ 33. Likewise, alternatives to complete closure existed and the closure was broader than necessary because the trial court could have removed only the disruptive spectators. *Id.* at ¶ 34. Finally, the supreme court found that the trial court did not make adequate findings to support the closure. *Id.* at ¶ 35.

¶ 24 The United States Supreme Court decision in *Presley* is also instructive. There, the trial judge excluded the defendant's uncle, the only spectator present at the time, from the courtroom during

jury selection. *Presley*, 558 U.S. at 210. The defendant objected, but the trial court explained that, given the size of the jury pool, "[t]here just isn't space for them to sit in the audience," and the "uncle cannot sit and intermingle with members of the jury panel." *Id.* After the defendant was convicted, he moved for a new trial and presented evidence showing that prospective jurors could have been accommodated in the jury box and one half of the courtroom, leaving the other half of the courtroom open for public seating. *Id.* at 210-11. The trial judge denied the motion, expressing concern that "family members in the courtroom [might have] . . . intermingle[d] with the jurors." *Id.* at 211.

¶ 25    The Supreme Court reversed the defendant's conviction. In applying the *Waller* test, the Court concluded,

> The generic risk of jurors overhearing prejudicial remarks, unsubstantiated by any specific threat or incident, is inherent whenever members of the public are present during the selection of jurors. If broad concerns of this sort were sufficient to override a defendant's constitutional right to a public trial, a court could exclude the public from jury selection almost as a matter of course.

*Id.* at 215.  It also concluded that the trial court did not "consider all reasonable alternatives to closure," *id.* at 216, explaining as follows:

> Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials. . . .  Without knowing the precise circumstances, some possibilities include reserving one or more rows for the public; dividing the jury venire panel to reduce courtroom congestion; or instructing prospective jurors not to engage or interact with audience members.

*Id.* at 215.

## C.    Application

¶ 26    Applying both *Rios* and *Bialas*, we first conclude that a total closure occurred when the court excluded all members of the public from the courtroom during voir dire.  *See People v. Black,* 2022 COA 127, ¶ 46 ("[B]y telling the only member of the public who was present at the start of voir dire to leave (albeit temporarily), the district court completely closed the courtroom to the public.").  The record shows, and no one disputes, that the court excluded the public from the physical courtroom for jury selection, which lasted the entire first day of trial.  Thus, a total closure occurred.  *Bialas,* ¶ 24.  Moreover, for the reasons articulated in *Rios* and *Bialas,* we

reject the People's argument that the public's opportunity to view jury selection virtually constituted an acceptable alternative. *Rios*, ¶ 36; *Bialas*, ¶ 21. Indeed, while the constitutional right to a public trial is not without limits, it requires the reasonable opportunity to be physically present to observe those court proceedings that fall within the public trial right. *Waller*, 467 U.S. at 48.

¶ 27 Next, we conclude that the closure was intentional and nontrivial. The record shows, and the parties do not dispute, that the court's decision was intentional and elicited an objection from both sides. Additionally, the closure lasted for one full day of an eight-day trial, encompassed all of jury selection, and was not later memorialized in open court. *See Lujan*, ¶ 19; *see also Jones*, ¶¶ 41-42 (holding that a closure lasting an entire afternoon during a ten-day trial was nontrivial); *Hassen*, ¶ 16 (holding that a closure during two witnesses' testimony was nontrivial).

¶ 28 Having found a nontrivial closure, we now turn to the *Waller* factors. Concerning the first factor, we note that neither party sought to close the proceedings to the public, but the trial court acted sua sponte. The court cited space limitations in the courtroom and noted there were only twelve spectators. It decided

to permit the twelve members of the public to view jury selection virtually in lieu of watching in person and said they could return to the courtroom after voir dire. We are not convinced that space alone constitutes an overriding interest justifying a complete closure. *Cf. Black*, ¶ 47 (a "good reason" was given when the trial court asked a lone observer to temporarily leave at the outset of voir dire because an additional chair could not be accommodated in the courtroom due to "fire safety"). But even if it were, we conclude that the remaining *Waller* factors are not satisfied.

¶ 29    The record shows that the prosecutor suggested that the court split voir dire into two sessions.[1] *See Bucci v. United States*, 662 F.3d 18, 26 (1st Cir. 2011) ("[E]ven if the courtroom were completely filled with prospective jurors, it would likely not justify the closure in this case. The Supreme Court in *Presley* made clear that alternative methods of increasing the available public seating, such as splitting the venire, must be adopted if reasonable.").

---

[1] The prosecutor also suggested simultaneous virtual proceedings in another courtroom and streaming the proceedings virtually, options that the supreme court rejected in *Rios* and *Bialas* because they failed to satisfy the public trial right. *Rios,* ¶ 45; *Bialas,* ¶ 3.

Additionally, defense counsel proposed that the court allow jurors on one side of the courtroom and spectators on the other side with an instruction that the two groups do not commingle. Another option, assuming there was inadequate space for all twelve spectators present at the beginning of voir dire to remain seated, could have been to admit members of the public to the courtroom as jurors were excused. *See Owens v. United* States, 483 F.3d 48, 62 (1st Cir. 2007) ("Even assuming that the courtroom needed to be initially cleared of spectators, once prospective jurors began to leave the courtroom, . . . we see no state interest — compelling or otherwise — in not permitting [the defendant's] family, friends, or other members of the public to observe the proceedings." (footnote omitted)), *abrogated on other grounds by*, *Weaver*, 582 U.S. at 293-301.

¶ 30    The court rejected these suggestions without explaining why they would not work and presumably based on its belief that livestreaming voir dire was sufficient to preserve Sandoval's right to a public trial. Accordingly, we conclude the trial court failed to consider reasonable alternatives and that the closure was broader than necessary.

¶ 31 Finally, despite the prosecutor's specific request to make findings under *Waller*, the trial court did not do so. *See Waller*, 467 U.S. at 48 (holding that the trial court "must make findings adequate to support [a] closure"). "[I]f a court intends to exclude the public from a criminal proceeding, it *must* first analyze the *Waller* factors and make specific findings with regard to those factors." *United States v. Gupta*, 699 F.3d 682, 687 (2d Cir. 2012). "If a trial court fails to adhere to this procedure, any intentional closure is unjustified and will, in all but the rarest of cases, require reversal." *Id.*

¶ 32 Accordingly, because the exclusion of the entire public from the physical courtroom during jury selection constituted a nontrivial closure that did not satisfy the *Waller* factors, we conclude that the closure violated Sandoval's Sixth Amendment right to a public trial. We reverse his conviction and sentence and remand for a new trial.

### III. Remaining Issues

¶ 33 Because the jury acquitted Sandoval of first degree murder and he will be retried on the lesser offense of second degree murder, we conclude that the remaining issues raised in his opening brief

are unlikely to occur on a retrial; thus, we do not address them further.  *See People v. Curtis*, 2014 COA 100, ¶ 12 (The "cardinal principle of judicial restraint [is that] if it is not necessary to decide more, it is necessary not to decide more." (quoting *PDK Lab'ys Inc. v. U.S. Drug Enf't Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment))).

## IV.     Disposition

¶ 34     The judgment is reversed, and the case is remanded for a new trial.

JUDGE PAWAR and JUDGE YUN concur.